IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

DUKE BRADFORD, ET AL.     :
                          :     No. 22-1023
                          :
Plaintiff-Appellants      :
                          :
v.                        :
                          :
U.S. DEPT. OF LABOR, ET AL.  :
                          :
                          :
Defendant-Appellees       :

MOTION FOR INJUNCTION PENDING APPEAL
_____

INTERLOCUTORY APPEAL FROM THE JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

No. 1:21-cv-3283
THE HONORABLE PHILIP A. BRIMMER
CHIEF DISTRICT JUDGE
_____

February 1, 2022                  Caleb Kruckenberg
                                  Michael A. Poon
                                  Steven M. Simpson

                                  *Counsel for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................... iii

I.  FACTS AND PROCEDURAL HISTORY ......................................... 2

A. Prior Agency Action ......................................................... 2

B. The New Rule ..................................................................... 4

C. The Plaintiffs-Appellants .............................................. 6

D. Procedural History ........................................................... 9

II.  ARGUMENT ...................................................................... 10

A. This Court Should Enjoin the Rule Pending Appeal ................. 10

1. This Court Has Jurisdiction Over this Matter .................... 11

2. Appellants Have Demonstrated Substantial Questions on the Merits, Making the Issue Deserving of More Deliberate Investigation ......................................... 12

i.    The Rule Is Not a Permissible Regulation of Procurement Policy ...................................... 12

ii.   The Rule Is Not Necessary for Economical and Efficient Procurement Policy ..................................... 16

iii.  This Court Must Read the Statute Narrowly to Avoid Major Policy Questions ................................. 21

3. Appellants Will Suffer Irreparable Harm ........................... 24

4. The Injunction Is Equitable and in the Public Interest ....... 27

B. Alternatively, Expedited Consideration Is Warranted ............. 28

CONCLUSION ...................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. Kahn,*
 618 F.2d 784 (D.C. Cir. 1979) .................................................. 14, 16, 18

*Alabama Ass'n of Realtors v. HHS,*
 141 S. Ct. 2485 (2021) ................................................................. 22

*Alaska Airlines, Inc. v. Brock,*
 480 U.S. 678 (1987) ..................................................................... 21

*Alaska Airlines, Inc. v. Donovan,*
 766 F.2d 1550 (D.C. Cir. 1985) ................................................... 21

*Bowen v. Georgetown Univ. Hosp.,*
 488 U.S. 204 (1988) ..................................................................... 12

*California v. Azar,*
 911 F.3d 558 (9th Cir. 2018) ........................................................ 25

*Chamber of Com. v. Edmondson,*
 594 F.3d 742 (10th Cir. 2010) ............................................. 24, 26, 27

*Christian Legal Soc'y v. Martinez,*
 561 U.S. 661 (2010) ..................................................................... 14

*Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City,*
 685 F.3d 917 (10th Cir. 2012) ................................................. 17, 20

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities
 Master Fund Ltd.,*
 598 F.3d 30 (2d Cir. 2010) .......................................................... 11

*City of Albuquerque v. U.S. Dep't of Interior,*
 379 F.3d 901 (10th Cir. 2004) ...................................................... 16

*Cloud Peak Energy Inc. v. U.S. Dep't of Interior*,
    415 F. Supp. 3d 1034 (D. Wyo. 2019) ................................................ 25

*Dine Citizens Against Ruining Our Env't v. Jewell*,
    839 F.3d 1276 (10th Cir. 2016) ........................................................... 11

*Kentucky v. Biden*,
    --- F.4th ----, 2022 WL 43178 (6th Cir. Jan. 5, 2022) ................... 16, 20

*Kentucky v. Biden*,
    No. 3:21-CV-55, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) ..................................................................................................... 20

*King v. Burwell*,
    576 U.S. 473 (2015) ............................................................................. 22

*McClendon v. City of Albuquerque*,
    79 F.3d 1014 (10th Cir. 1996) ............................................................. 11

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022) ............................................................. 23, 24, 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................... 10, 27

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ...................................................................... 22, 23

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) .......................................................................... 11, 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................. 12

## Statutes

5 U.S.C. § 702 .......................................................................... 11, 24

5 U.S.C. § 706(2)(A) ...................................................................... 11

5 U.S.C. § 706(2)(C) ................................................................. 11, 12

7 U.S.C. § 706(2)(A) ................................................................ 21

28 U.S.C. § 1292(a)(1) ............................................................ 12

28 U.S.C. § 1331 .................................................................... 11

28 U.S.C. § 2201 .................................................................... 11

28 U.S.C. § 2202 .................................................................... 11

40 U.S.C. § 101 ....................................................................... 2

40 U.S.C. § 101(1) ............................................ 12, 13, 14, 17, 20

40 U.S.C. § 101(2) .................................................................. 13

40 U.S.C. § 101(3) .................................................................. 13

40 U.S.C. § 101(4) .................................................................. 13

40 U.S.C. § 121(a) ............................................................. 12, 17

**Regulations**

29 C.F.R. § 10.2 ...................................................................... 2

29 C.F.R. § 10.5(a) .................................................................. 2

29 C.F.R. § 10.24(a) ................................................................ 2

*Establishing a Minimum Wage for Contractors*, 79 Fed. Reg.
    60,634 (Oct. 7, 2014) ......................................................... 2

*Establishing a Minimum Wage for Contractors*, 79 Fed. Reg.
    9851 (Feb. 12, 2014) .......................................................... 2

*Exemption from Executive Order 13658 for Recreational
    Services on Federal Lands*, 83 Fed. Reg. 25,341 (May 24,
    2018) ................................................................... 3, 18, 19

*Exemption from Executive Order 13658 for Recreational
    Services on Federal Lands*, 83 Fed. Reg. 48,537 (Sept. 26,
    2018) ................................................................................. 4

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure, Appellants Duke Bradford, Arkansas Valley Adventure, LLC d/b/a AVA Rafting and Zipline (AVA) and the Colorado River Outfitters Association (CROA), move for an injunction pending interlocutory appeal prohibiting Appellees Pres. Joseph R. Biden, Sec. Martin J. Walsh, Acting Admin. Jessica Looman, the U.S. Dept. of Labor, and the Wage & Hour Division (collectively DOL or the Department) from enforcing the rule, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 23, 2021), pending final judgment in this matter. Alternatively, Appellants request expedited consideration of their interlocutory appeal. Appellees oppose the requested injunction, however they do not oppose expedited review.

DOL's rule took effect on January 30, 2022, and, unless enjoined, will force Appellants to incur significant compliance, implementation, and direct wage costs. Those costs are not recoverable from the Department however and are thus irreparable. Appellants have raised substantial questions concerning the rule's validity, particularly in light of its significant impact and the novelty of the issues presented in this case. Rather than risk the irreparable harms to Appellants, this Court

should enjoin the rule pending appeal. Alternatively, it should expedite the appeal.

## I. FACTS AND PROCEDURAL HISTORY

As set out in their Complaint, Appellants have been ordered to implement a minimum wage requirement of $15/hr plus overtime based on a rule that took effect on January 30, 2022. *See* Attachment A; ECF No. 1.

### A. Prior Agency Action

On February 12, 2014, President Obama issued Executive Order 13658, *Establishing a Minimum Wage for Contractors*, putatively under the Federal Property and Administrative Services Act (The Procurement Act), 40 U.S.C. § 101, directing DOL to establish a minimum wage for "federal contractors and subcontractors." 79 Fed. Reg. 9851, 9852–53.

DOL then issued a rule mandating a $10.10/hr minimum wage. *Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634 (Oct. 7, 2014); 29 C.F.R. §§ 10.5(a), 10.24(a). It applied to all new "contracts or contract-like instruments," which was an "intentionally all-encompassing" definition that included employers with "special use permits" for federal lands. 79 Fed. Reg. at 60,652; 29 C.F.R. § 10.2.

In 2018, President Trump issued EO 13838, exempting outfitters and guides from the minimum wage rule. *Exemption from Executive Order 13658 for Recreational Services on Federal Lands*, 83 Fed. Reg. 25,341 (May 24, 2018). As the President explained, the rule applied "to outfitters and guides operating on Federal lands," but

> [t]hese individuals often conduct multiday recreational tours through Federal lands, and may be required to work substantial overtime hours. The implementation of Executive Order 13658 threatens to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors. Seasonal recreational workers have irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate, among other distinguishing characteristics. As a consequence, a minimum wage increase would generally entail large negative effects on hours worked by recreational service workers. Thus, applying Executive Order 13658 to these service contracts does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands.

*Id.*

> DOL issued a rule implementing the order, noting that:

> Lowering the cost of business for outfitter providers could incentivize small outfitters to enter the market. Likewise, it could also incentivize existing outfitters to hire more guides and to increase the hours of current employees. What all this translates into is more affordable guided tours and recreational services for visitors to Federal lands. And ultimately, greater access to outfitter services affords

3

ordinary Americans a greater opportunity to experience "the great beauty of America's outdoors." E.O. 13838.

83 Fed. Reg. 48,537, 48,540 (Sept. 26, 2018).

## B. The New Rule

On April 27, 2021, President Biden reversed course, issuing EO 14026, *Increasing the Minimum Wage for Federal Contractors*, raising the previous threshold to $15/hr for covered employees. 86 Fed. Reg. 22,835. The EO also revoked the exemption for recreational services on federal lands but provided no explanation why. *See id.* at 22,836–37.

On November 23, 2021, DOL issued its final rule implementing the order, effective January 30, 2022. 86 Fed. Reg. 67,126. DOL confirmed that the rule's $15/hr minimum wage applied to recipients "of special use permits." *Id.* at 67,147.

DOL estimated the rule would affect more than 500,000 private firms, including approximately 40,000 firms that provide concessions or recreational services pursuant to special use permits on federal lands. *Id.* at 67,194–96. DOL also estimated the rule would result in "transfers of income from employers to employees in the form of higher wage rates" of "$1.7 billion per year over 10 years," with "average annualized direct

4

employer costs" of "$2.4 million" for each firm. *Id*. at 67,194. Unsurprisingly, the "final rule is economically significant[.]" *Id*.

The rule recognized that these significant cost increases, as well as other costs such as "regulatory familiarization costs and [] implementation costs," would likely be passed on to the government itself—at least as to procurement contracts. *Id*. at 67,204, 67,206. Thus, "Government expenditures may rise." *Id*. at 67,206.

The repercussions for recreational firms holding permits to use federal lands, however, were far more severe. As DOL recognized, such firms are "[n]on-procurement," as they do not sell goods or services to the government. *Id*. Thus, these firms "cannot as directly pass costs along to the Federal Government." *Id*. As a result, the rule "may result in reduced profits" for such firms, or outright losses, ameliorated only to the extent consumers are willing to pay "higher prices." *Id*. DOL also recognized that the rule could cause "disemployment" amongst companies operating on federal lands. *Id*. at 67,211. The rule might also place permittees at a competitive disadvantage with competitors not operating on federal lands. *Id*. at 67,208. And because permittees will be forced to raise prices, and permit fees are pegged to prices, permit fees will also rise. *Id*.

Despite these repercussions, the rule provided no justification for revoking the exemption. It did not even discuss its former rationale for exempting permittees, nor did it consider alternatives for permittees, or discuss its legal authority to regulate admittedly "non-procurement" firms. *See id.* at 67,129, Instead, because the "purpose of this rulemaking is to implement Executive Order 14026," DOL viewed itself as having no discretion to consider these issues. *Id.* at 67,129, 67,216.

Likewise, DOL did not explain how the revocation of the recreational-industry exemption benefited the economy and efficiency of government procurement. Indeed, while it asserted that the rule would improve government services for procurement firms, the Department acknowledged that this benefit would "not apply to the outfitters and guides industry." *Id.* at 67,212.

## C. The Plaintiffs-Appellants

AVA is a licensed river outfitter headquartered in Buena Vista, CO. Attachment B, Bradford Decl. ¶¶ 2–3. AVA has been in business for over 20 years and relies on special use permits to operate its business. *Id.* ¶3.

Every season AVA employs about 250 people. *Id.* ¶ 5. AVA recruits experienced guides who typically negotiate fixed rates based on the

number of days a trip is expected to take. *Id.* If paid hourly, these rates would typically exceed $15/hr. *Id.* However, because the trips last for multiple days, the guides work far more than 40 hours in a typical week. *Id.*

AVA will need to expend resources immediately to ensure compliance with the rule's imminent effect. As Mr. Bradford testified, he expects to expend "between five and $10,000" just on attorney costs prior to the effective date. Attachment C; Preliminary Injunction Hearing Transcript, Bradford Testimony at 20:1–11 (Jan. 6, 2022). He also explained that his company would need to spend more on wage costs, hire more staff, limit hours for existing staff, and provide more housing for employees, all of which "will drive expenses up." *Id.* at 20:18–21:21. He would also need to eliminate overnight rafting trips entirely or else the "price would go beyond what our public could afford." *Id.* at 21:22–22:2. The rule would further make AVA less competitive with other outfitters not subject to the rule. *Id.* at 21:12–23:2. Ultimately, "costs would go up and revenue would go down," under the new rule. *Id.* at 23:21.

CROA is a trade association representing as many as 50 independently operating river outfitters, including AVA. Attachment D,

Costlow Decl. ¶¶ 3, 6. Most of CROA's members operate on federal lands under special use permits. *Id*. ¶ 6. The outfitters typically pay the government a fixed percentage of any fees they charge for services, regardless of profit or loss. *Id*. ¶ 8.

Like AVA, CROA's members typically pay their guides a flat fee on a per-trip basis. *Id*. ¶ 8. The work is seasonal, however, so many guides work as many hours as they can through the busy season—almost always working more than 40 hours in a week. *Id*. Increasing the wages for guides to $15/hr and paying overtime based on that wage would dramatically increase wage costs. *Id*. ¶¶ 10, 14. To continue to operate, many of these outfitters would be forced to significantly raise the costs of their services to customers and eliminate many multi-day trips. *Id*.

CROA members will need to comply with the rule immediately to prepare for the upcoming 2022 season. *Id*. ¶ 12. At least one member will need to renew their permit in February 2022, at which point they must comply with the new wage rules. *Id*. Additionally, CROA members expect to pay new implementation and compliance costs to ensure they meet the new rule's requirements. *Id*. ¶ 13.

## D. Procedural History

Appellants filed a Complaint for declaratory relief on December 7, 2021, challenging the rule. Attachment A. They then moved for a preliminary injunction on December 9, 2021. Attachment E; ECF No. 7. Defendants-Appellees filed an opposition on December 27, 2021, Attachment F; ECF No. 21, to which Appellants replied on December 29, 2021. Attachment G; ECF No. 22.

The district court held an evidentiary hearing on January 6, 2022, and then on January 24, 2022, it denied the request for a preliminary injunction in a written opinion. Attachment H; ECF No. 31.

The district court addressed only one of the relevant factors—"likelihood of success on the merits." Attachment H at 16. Because it concluded that Appellants were wrong in their legal theory, the court denied the "motion for a preliminary injunction without addressing the remaining preliminary injunction factors." *Id.* at 46.

Appellants filed a notice of interlocutory appeal on January 26, 2022, and, the next day filed a motion for an injunction pending appeal with the district court. The district court denied that motion on February 28, 2022. ECF No. 38.

## II. ARGUMENT

### A. This Court Should Enjoin the Rule Pending Appeal

Rule 8 of the Federal Rules of Appellate Procedure allows this Court to issue an "injunction pending appeal." Under Circuit Rule 8.1 a proponent of the injunction must show "(A) the basis for the district court's . . . subject matter jurisdiction and the basis for the court of appeals' jurisdiction[.]; (B) the likelihood of success on appeal; (C) the threat of irreparable harm if the stay or injunction is not granted; (D) the absence of harm to opposing parties if the stay or injunction is granted; and (E) any risk of harm to the public interest."

While there is "substantial overlap" between this standard and that governing preliminary injunctions, they are not identical. *Nken v. Holder*, 556 U.S. 418, 434 (2009). If a party "can meet the other requirements for a stay pending appeal, they will be deemed to have satisfied the likelihood of success on appeal element if they show questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation."

*McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996)

(citation omitted).[1]

## 1. This Court Has Jurisdiction Over this Matter

Appellants argued that the rule was invalid under 5 U.S.C. § 706(2)(A) and (C) and the U.S. Constitution's Non-Delegation Provisions in Article I, §1, and Article II, §3. Attachment A. Appellants also moved for a preliminary injunction pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 65(a) of the Federal Rules of Civil Procedure. Attachment B.

The district court had jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331 because Appellants challenged the statutory and constitutional validity of the rule. This Court has jurisdiction to review

---

[1] This Court previously applied this same relaxed standard in certain circumstances when reviewing a district court's denial of a preliminary injunction under Rule 65. *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). That standard has been abrogated with respect to Rule 65, in reliance on the Supreme Court's decision in in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). *Id*. However, because the *Winter* decision did not address the separate standard of whether a *stay pending appeal* is appropriate, the lower standard applies in this context. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37, 37 n.7 (2d Cir. 2010) (noting that the "serious question" standard remains the "standard for granting a stay pending appeal," which need have a likelihood of success that is "better than negligible" but need not be "more likely than not") (quoting *Nken*, 556 U.S. at 434).

"interlocutory orders of the district courts of the United States" "refusing . . . injunctions." 28 U.S.C. § 1292(a)(1).

### 2. Appellants Have Demonstrated Substantial Questions on the Merits, Making the Issue Deserving of More Deliberate Investigation

### i. The Rule Is Not a Permissible Regulation of Procurement Policy

The executive branch's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Likewise, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). An agency's rule that is "in excess of statutory . . . authority" must be set aside. 5 U.S.C. § 706(2)(C).

The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" "economical and efficient" government procurement "activities." 40 U.S.C. §§ 101(1), 121(a). The Act lists four potential "activities" under the President's authority: (1) "procuring and supplying property and nonpersonal services[;]" (2) "[u]sing available property[;]" (3) "[d]isposing

of surplus property[;]" and (4) "[r]ecords management." *Id.* at §§ 101(1)–(4).

The district court sustained the rule as a permissible regulation over "supplying . . . nonpersonal services," but that does not fit with the rule at issue. *See* Attachment H at 18. As Appellants argued below, regardless of the scope of *what* a nonpersonal service is, the Act only empowers the President to control the "supply[]" of nonpersonal services by "*the Federal Government.*" 40 U.S.C. § 101(1) (emphasis added); *see also* Attachment G at 2. However, the government does not supply the relevant recreational services; AVA and CROA members do.

Appellants engage with consumers on their own behalf, and the consumers have no economic relationship with the government. In fact, and somewhat ironically, the district court determined that the relevant permits dealt with "nonpersonal services" precisely because they did "not subject [Appellants] to the supervision and control of the government" in providing services to their customers. Attachment H at 19. But because the government merely *permits* AVA to provide its services on federal land, that does not mean the government is providing services. After all, a public school that allows a religious group to use its facilities does not

provide religious services itself. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 684–85 (2010). So too here.

This is different from a situation in which the government provides services with the aid of a contractor. For example, § 101(1) might govern if the federal government provided the public with access to a federal campground while contracting with AVA to act as the camp host and assist campers on the government's behalf. In such arrangements, the consumer's relationship is with the government, not the outside firm, which merely acts on the government's behalf.

It makes sense that the Act encompasses this sort of arrangement: the government may supply services to the public with the assistance of outside firms, which it *procures*. And the Act enables the government to supply those services efficiently by procuring assistance economically. Only in this context is the D.C. Circuit's focus on a sufficient "nexus between . . . wage and price standards and *likely savings to the Government*" sensible. *AFL-CIO v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (en banc) (emphasis added). But here the government has not procured Appellants' services to supply to the public on the government's behalf, and the Act is inapplicable.

14

The district court sidestepped these arguments. Resting only on the fact that "the government is concerned with the ways in which outfitters supply recreational services to the public," the district court concluded that the government supplies recreational services through contracts with Appellants. Attachment H at 18. But the government's concern with how activities under a permit are conducted does not transform the government's role into the entity conducting those activities. Indeed, as the district court emphasized, the permits did "not subject [Appellants] to the supervision and control of the government." Attachment H at 19. Thus, it can't be said that *the government* is supplying services *through* Appellants.

The district court's reading would construe the government to be supplying every service requiring a permit simply because the government *allows* the actual provisioners of such services to operate pursuant to permits. Such a reading would then grant the President extraordinary unilateral power over these sectors under the provisions of the Act. That cannot be the case.

### ii. The Rule Is Not Necessary for Economical and Efficient Procurement Policy

Even in traditional procurement contexts courts have concluded that "some content must be injected into the general phrases 'not inconsistent with' the [Act] and 'to effectuate the provisions' of the Act," to avoid a completely "open-ended" grant of authority. *Kahn*, 618 F.2d at 788. "Any order" "must accord with the values of 'economy' and 'efficiency,'" and have "a sufficiently close nexus between those criteria and the procurement [] program[.]" *Id.* at 792; *accord City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) (requiring that "the President's exercise of authority establish an economical and efficient system for the procurement and supply of property") (cleaned up). The "nexus" to cost savings must be "close," and must relate to "procurement and supply," not other benefits asserted "as a naked pretext." *Kentucky v. Biden*, --- F.4th ----, 2022 WL 43178, at \*14, 16 (6th Cir. Jan. 5, 2022). It is "important[t]," therefore, for the President to show a "nexus between the wage and price standards and likely savings to the Government." *Kahn*, 618 F.2d at 793.

These limits derive from the ordinary meanings of the statutory terms. The Act limits the President to actions he "considers necessary"

16

for "economical and efficient" "[p]rocuring and supplying property." 40 U.S.C. §§ 101(1), 121(a). Necessary means "more than something merely helpful or conducive." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012) (citation omitted). "It suggests instead something indispensable, essential, something that cannot be done without." *Id.*

The terms "economical and efficient" also have an understood meaning. "Economical" implies the use of fewer resources. *Economical*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary /economical (last accessed Jan. 27, 2022). "Efficient" likewise suggests *less* of something—"capable of producing desired results without wasting materials, time, or energy." *Efficient*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/efficient (last accessed Jan. 27, 2022).

The President's authority is therefore limited to actions that he considers "essential" or "indispensable" to provide the "prudent use" of government resources "without wasting materials." *See* 40 U.S.C. §§ 101(1), 121(a). Or, as the Court in *Kahn* said, actions that "likely have

17

the direct and immediate effect of holding down the Government's procurement costs." 618 F.2d at 792.

DOL's invocation of the Procurement Act cannot be justified. For actual procurement contractors, DOL expects increased wage costs to be passed on to the government, and thus "Government expenditures may rise." 86 Fed. Reg. at 67,206. Non-procurement firms, like Appellants, will have to make up their losses from "the public in the form of higher prices," at least to the extent that the public is willing to bear them. *Id.* To the extent the public is unwilling to pay, Appellants will be less competitive, and their guides will face "disemployment" of up to 0.9%. *Id.* at 67,207, 67,211. The net result will be *more* costs to the public, to non-procurement firms, and to the government—the opposite of a permitted action under the Act. *See Kahn*, 618 F.2d at 792.

The Executive Branch itself previously arrived at the same conclusions. EO 13838 concluded that applying the contractor minimum wage standards "to outfitters and guides operating on Federal lands," "does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands." 83 Fed. Reg. 25,341. Instead, such a wage "threatens to raise significantly the cost of

18

guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors." *Id.* DOL previously emphasized that rescinding the prior wage rule for these businesses would "[l]ower[] the costs of business," and "incentivize existing outfitters to hire more guides and to increase the hours of current employees." 83 Fed. Reg. at 48,541. *Significantly increasing* the minimum wage would have the opposite effect—increasing costs, cutting hours for guides, and limiting access to public lands.

DOL doesn't even try to show cost savings from the rule, listing instead factors that won't apply to those with special use permits or that have nothing to do with efficiency or economy in government expenditures. The Department says the rule could: (1) improve government services; (2) increase morale and productivity; (3) reduce turnover; (4) reduce absenteeism; and (5) reduce poverty and income inequality. 86 Fed. Reg. at 67,195. Employers like Plaintiffs, who merely have special use permits, provide no "government services" though, so that benefit would "not apply to the outfitters and guides industry." *See id.* at 67,212. The remaining purported benefits bear a striking resemblance to the benefits deemed too attenuated from procurement

19

economy and efficiency to support the contractor vaccine mandate and are likewise inadequate to justify the rule here. *See Kentucky v. Biden*, No. 3:21-CV-55, 2021 WL 5587446, at *6 (E.D. Ky. Nov. 30, 2021) (purported benefits of mandate to "(1) decrease worker absence; (2) decrease labor costs; and (3) improve efficiency at work sites," did not relate to "*procurement and supply*" and it "strained credulity" to think that Congress meant to empower the President in such a fashion), *injunction upheld by* 2022 WL 43178, at *12.

These purported benefits are not the ones required by the Procurement Act—"economical and efficient" use of *government* resources. *See* 40 U.S.C. §§ 101(1); 120(a). DOL agrees that these "benefits are not monetized," but that means that they cannot be shown to result in cost savings, much less cost savings to the *government*. To the extent the rule serves other policy goals, it cannot be said to be "necessary" for the statutory aims. *See Cinnamon Hills*, 685 F.3d at 924.

The district court rejected this argument because applying a "lenient" standard of review, even though it might be inefficient and uneconomical for *Appellants*, the "relevant savings is not to individual contractors or contractors as a whole, but rather to the government."

Attachment H at 26–27. But that conflicts with DOL's own analysis that for typical procurement contractors "Government expenditures may rise." 86 Fed. Reg. at 67,206. Moreover, even if the factual premise were correct, rules are reviewed in their entirety, not piecemeal. *See* 7 U.S.C. § 706(2)(A) ("reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law). Perhaps the district court's view implicated concerns about potential severance of the rule, but if "only one part of one subsection" of a rule is invalid, then, at minimum, a court must vacate *that* provision. *See Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1560 (D.C. Cir. 1985), *aff'd sub nom. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987). The district court improperly allowed the arguably lawful part of the rule to make up for the unlawful.

### iii. This Court Must Read the Statute Narrowly to Avoid Major Policy Questions

This Court can resolve this case by simply looking to the plain language of the statute and concluding that the rule exceeds the President's authority. However, applying the major questions doctrine, this Court should also grant the injunction because there is no clear congressional authorization for the rule.

21

Courts will not assume that Congress has assigned to the Executive Branch questions of "deep economic and political significance" unless Congress has done so "expressly." *King v. Burwell*, 576 U.S. 473, 486 (2015). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [the Court] typically greet[s] its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citations omitted). A court should thus adopt a narrow reading of a statute when an agency tries "to exercise powers of vast economic and political significance." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (citations omitted).

DOL rightly acknowledges that the rule "is economically significant," since it would result in *direct* costs to employers of "$1.7 billion per year over 10 years." 86 Fed. Reg. at 67,194. This is in *addition* to "regulatory familiarization costs," "implementation costs," "compliance costs, increased consumer costs, and reduced profits," "disemployment," and even increased "Government expenditures." *Id.* at 67,204, 67,206, 67,208, 67,211. This means this Court must meet DOL's rule "with a measure of skepticism," and look for a clear statement from Congress.

*Util. Air Regul. Grp.*, 573 U.S. at 304. As discussed above, the best DOL has is a reed-thin argument that this is all about "procurement," despite applying the rule to "non-procurement" firms. This Court should therefore reject DOL's recent discovery of its "unheralded power." *See id.*

The district court acknowledged the existence of the major questions doctrine, but declined to apply it because it determined that the challenged rule is not major enough. It declined to apply the doctrine because even if the challenged rule was "economically significant," "the economic effect is far below the range that the Office of Management and Budget quantifies to have a measurable effect, in macroeconomic terms, on the gross domestic product," "which is $52.3 billion." Attachment H at 31. But just a few weeks before that opinion, the Supreme Court applied the doctrine based on its unqualified statement that it applies whenever an agency exercises "powers of vast economic and political significance." *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (citation omitted). Moreover, in a concurring opinion Justice Gorsuch, joined by two others, noted that "[f]ar less consequential agency rules [than a vaccine mandate] have run afoul of the major questions doctrine," such as rate regulation for telephone companies. *Id.* at 668 (citing *MCI Telecommunications Corp. v.*

23

*American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994) (eliminating rate-filing requirement that might affect the prices of, at most, "40% of a major sector" of long-distance carriers)). There is simply no authority for the idea that the major questions doctrine empowers agency action until it reaches a $52.3 billion threshold. Instead, because the doctrine is about Congressional intent, it applies whenever a court cannot say with certainty that Congress meant for the outcome implicated by the rule. *See NFIB*, 142 S. Ct. at 665 (Gorsuch, J., concurring). That is the case here.

### 3. Appellants Will Suffer Irreparable Harm

"Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010). Compliance costs from a government rule, such as "implementation and training expenses," coupled with the risk of future consequences for "noncompliance," constitutes irreparable injury when the government is immune from damages because of sovereign immunity. *Id.* at 756–57, 771. The APA grants the sovereign immunity from monetary damages. *See* 5 U.S.C. § 702 (permitting only relief "other than money damages").

Thus, "the general rule that economic harm is not normally considered irreparable does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *Cloud Peak Energy Inc. v. U.S. Dep't of Interior*, 415 F. Supp. 3d 1034, 1043 (D. Wyo. 2019) (citations omitted); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("harm is irreparable here because the states will not be able to recover monetary damages" because of 5 U.S.C. § 702), *remanded on other grounds by* 141 S. Ct. 192 (2020).

Appellants have made a strong showing of the likelihood of irreparable harm. According to the Department, Appellants are among the estimated 500,000 firms that will pay direct wages increases of "$1.7 billion per year over 10 years," with "average annualized direct employer costs [] estimated to be $2.4 million" for each firm. 86 Fed. Reg. at 67,194. Plus, Appellants will incur additional "regulatory familiarization costs," "implementation costs," "compliance costs, increased consumer costs, [] reduced profits," reduced competitiveness, and "disemployment" of their workers. *Id.* at 67,204, 67,206, 67,208, 67,211.

Appellants have also confirmed that they will immediately begin suffering these harms. Mr. Bradford needed to expend "between five and

25

$10,000" just on attorney costs to ensure compliance before the rule took effect. Attachment C at 20:1–11. AVA will also need to spend more on wage costs, hire more staff, limit hours for existing staff, and provide more housing for employees, all of which "will drive expenses up." *Id.* at 20:18–21:21. Ultimately, "costs would go up and revenue would go down," under the new rule. *Id.* at 23:21.

CROA members would also need to expend similar costs immediately, with one member needing to renew a permit in February 2022. Attachment D ¶¶ 12–13. CROA members would also incur new compliance costs, new wage costs, reduced services, and have less competitiveness. *Id.* ¶¶ 10, 13–15.

Just as in *Edmondson*, which involved a challenge to a regulation that imposed new obligations on government contractors, Appellants will suffer irreparable harm without the injunction because they will be forced to expend resources to comply with the rule (or face enforcement actions), but those costs cannot be recovered from the Department should they ultimately prevail. *See* 594 F.3d at 770–71.

## 4. The Injunction Is Equitable and in the Public Interest

A party seeking a preliminary injunction must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. A government "does not have an interest in enforcing a law that is likely" invalid. *Edmondson*, 594 F.3d at 771. Instead, "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of [] law." *Id.* (citation omitted). Indeed, when a rule exceeds an agency's authority, the court should not "weigh [] tradeoffs" between its intended effect and harms. *NFIB*, 142 S. Ct. at 666.

Because DOL has not complied with limits on its authority, the equities favor an injunction pending appeal. *See id.* The rule will also result in, what DOL accepts to be, billions of dollars in potentially unlawful compliance expenditures in the rule's first year, which is an egregious harm to Appellants. *See* 86 Fed. Reg. at 67,194. On the other side of the ledger, DOL will be denied, at most, immediate enforcement of its rule.

## B. Alternatively, Expedited Consideration Is Warranted

Alternatively, this Court should expedite consideration of the interlocutory appeal. As discussed, Appellants will suffer immediate and irreparable costs from the rule. Appellees do not object to scheduling this matter for the May 2022 court sitting, with Appellants' opening merits brief due February 28, 2022, Appellee's response due March 28, 2022, and any reply due April 4, 2022.

## III. Conclusion

This Court should enjoin the rule pending a decision on the merits. Alternatively, this Court should expedite consideration of the appeal.

February 1, 2022

Respectfully,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
202-888-6881
CKruckenberg@pacificlegal.org
MPoon@pacificlegal.org
SSimpson@pacificlegal.org

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this document complies with Federal Rule of Appellate Procedure 27(d)(2)(A). It is printed in Century Schoolbook, a proportionately spaced font, and includes 5599 words, excluding items enumerated in Rule 32(f)). I relied on my word processor, Microsoft Word, to obtain the count.

I hereby certify that all required privacy redactions have been made pursuant to 10th Cir. R. 25.5, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Respectfully,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
202-888-6881
CKruckenberg@pacificlegal.org
MPoon@pacificlegal.org
SSimpson@pacificlegal.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
202-888-6881
CKruckenberg@pacificlegal.org
MPoon@pacificlegal.org
SSimpson@pacificlegal.org