FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**April 30, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

DUKE BRADFORD; ARKANSAS
VALLEY ADVENTURES, LLC, AKA
AVA Rafting and Zipline; COLORADO
RIVER OUTFITTERS ASSOCIATION,

      Plaintiffs - Appellants,

v.

U.S. DEPARTMENT OF LABOR; U.S.
DEPARTMENT OF LABOR, WAGE
AND HOUR DIVISION; JOSEPH R.
BIDEN, President of the United States;
JULIE A. SU,* U.S. Secretary of Labor;
JESSICA LOOMAN, Acting
Administrator,

      Defendants - Appellees.

------------------------------

ECONOMIC POLICY INSTITUTE;
NATIONAL EMPLOYMENT LAW
PROJECT; NATIONAL ABILITY
CENTER; NATIONAL WOMEN'S LAW
CENTER; STATE OF ARIZONA;
SERVICE EMPLOYEES
INTERNATIONAL UNION; STATE OF
ALABAMA; STATE OF ARKANSAS;
STATE OF GEORGIA; STATE OF
IDAHO; STATE OF INDIANA; STATE
OF LOUISIANA; STATE OF
MISSISSIPPI; STATE OF MISSOURI;

No. 22-1023

---

      * Pursuant to Fed. R. App. P. 43(c)(2), Julie A. Su is substituted for
Martin J. Walsh, former U.S. Secretary of Labor.

STATE OF MONTANA; STATE OF
NEBRASKA; STATE OF OKLAHOMA;
STATE OF SOUTH CAROLINA;
PUBLIC CITIZEN; SAFARI CLUB
INTERNATIONAL;
COMMUNICATIONS WORKERS OF
AMERICA; STATE OF ILLINOIS;
STATE OF CALIFORNIA; STATE OF
CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF MAINE;
STATE OF MARYLAND; STATE OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF
OREGON; STATE OF
PENNSYLVANIA; STATE OF RHODE
ISLAND; STATE OF VERMONT;
STATE OF WASHINGTON,

     Amici Curiae.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CV-03283-PAB-STV)**

---

Caleb Kruckenberg, Pacific Legal Foundation, Arlington, Virginia (Michael A. Poon,
Pacific Legal Foundation, Sacramento, California, and Steven M. Simpson, Institute for
Justice, Arlington, Virginia, with him on the briefs), for Plaintiffs-Appellants.

Daniel Winik, Attorney, U.S. Department of Justice, Civil Division, Washington, D.C.
(Brian M. Boynton, Principal Deputy Assistant Attorney General; U.S. Department of
Justice, Civil Division, Washington, D.C.; Cole Finegan, United States Attorney for the
State of Colorado; and Mark B. Stern, Attorney, United States Department of Justice,
Civil Division, Washington, D.C., with him on the brief), for Defendants-Appellees.

Drew C. Ensign, Deputy Solicitor General (Kris Mayes, Arizona Attorney General, with
him on the amici brief), Office of the Attorney General for the State of Arizona, Phoenix,

Arizona, filed on behalf of the States of Arizona, Alabama, Arkansas, Georgia, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, and South Carolina), for Amici Curiae.

Jeremy E. Clare and Regina Lennox, Safari Club International, Washington, D.C., filed an amicus brief on behalf of Safari Club International in support of Plaintiffs-Appellants.

Lucas C. Townsend, Gibson Dunn & Crutcher, Washington, D.C.;  Dayna Zolle Hauser, Gibson Dunn & Crutcher, Denver, Colorado and Ryan Azad, Gibson, Dunn & Crutcher, San Francisco, California, filed an amicus brief on behalf of The National Ability Center in support of Plaintiffs-Appellants.

Nandan M. Joshi and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., filed an amicus brief on behalf of Public Citizen in support of Defendants-Appellees.

Sean A. Lev and JoAnn Kintz, Democracy Forward Foundation, Washington, D.C., filed an amicus brief on behalf of National Employment Law Project, Communications Workers of American, Service Employees International Union, National Women's Law Center, and Economic Policy Institute in support of Defendants-Appellees.

Sarah A. Hunger, Deputy Solicitor General, Kwame Raoul, Attorney General and Jane Elinor Notz, Solicitor General, Office of the Attorney General for the State of Illinois, Chicago, Illinois, filed an amicus brief on behalf of the States of Illinois, California, Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington in support of Defendants-Appellees.

_____

Before **HOLMES**, Chief Judge, **EBEL**, and **EID**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Plaintiffs-Appellants Duke Bradford, Arkansas Valley Adventure (AVA), and the Colorado River Outfitters Association (CROA) appeal from the District of Colorado's order denying their motion to preliminarily enjoin a Department of Labor (DOL) rule requiring federal contractors to pay their employees a $15.00 minimum

hourly wage.  The DOL promulgated the rule pursuant to a directive in Executive

Order (EO) 14,026, which President Biden issued on April 27, 2021.  EO 14,026

imposed the minimum wage requirement on most federal contractors, and it

rescinded an exemption for recreational services outfitters that operate pursuant to

permits on federal lands, which President Trump had adopted in EO 13,838.

President Biden issued EO 14,026 pursuant to his authority under the Federal

Property and Administrative Services Act ("FPASA"), 40 U.S.C. §§ 101–1315,

which authorizes the President to "prescribe policies and directives that the President

considers necessary to carry out" FPASA and that are "consistent with" FPASA, 40

U.S.C. § 121(a).  One purpose of FPASA is to "provide the Federal Government with

an economical and efficient system for . . . [p]rocuring and supplying property and

nonpersonal services."  40 U.S.C. § 101(1).[1]

    Appellants argue that the district court erred in concluding that FPASA

authorizes the minimum wage rule as applied to recreational services permittees

because the government does not procure any services from them or supply anything

to them.  They also argue that the DOL acted arbitrarily and capriciously in

promulgating the minimum wage rule without exempting recreational service

permittees.

---

    [1]    As discussed further *infra*, a "[n]onpersonal services contract means a contract under which the personnel rendering the services are not subject . . . to the supervision and control usually prevailing in relationships between the Government and its employees."  48 C.F.R. § 37.101.

Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we **affirm**. We first conclude that Appellants have not shown a substantial likelihood of success on the merits that the DOL's rule was issued without statutory authority. Specifically, the district court did not err in concluding that FPASA likely authorizes the minimum wage rule because the DOL's rule permissibly regulates the supply of nonpersonal services and advances the statutory objectives of economy and efficiency. Furthermore, we hold that Appellants have not shown a substantial likelihood of success on the merits that the DOL's rule is arbitrary and capricious. In sum, we conclude that the district court did not err in denying Appellants' motion for a preliminary injunction.

## I

### A

On February 12, 2014, President Obama issued Executive Order 13,658, *Establishing a Minimum Wage for Contractors*, pursuant to his authority under FPASA. *See* 79 Fed. Reg. 9851 (Feb. 12, 2014) (to be codified at 29 C.F.R. pt.10). FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act and that are "consistent with" the Act. 40 U.S.C. § 121(a). The purpose of FPASA is to "provide the Federal Government with an economical and efficient system for," *inter alia*, "[p]rocuring and supplying property and nonpersonal services." 40 U.S.C. § 101(1).

EO 13,658 directed executive departments and agencies, including the DOL, to include a clause in certain "new contracts, contract-like instruments, and

solicitations" specifying that the contractor will pay a minimum wage of $10.10 per hour. 79 Fed. Reg. at 9851. EO 13,658 reflected President Obama's determination that "[r]aising the pay of low-wage workers increases their morale and the productivity and quality of their work, lowers turnover and its accompanying costs, and reduces supervisory costs." *Id*.

The order directed the Secretary of the DOL (the "Secretary") to issue regulations implementing the order, and, pursuant to this authority, the order authorized the Secretary to define a "new contract or contract-like instrument." *Id.* at 9852–53.

Following notice and comment, the DOL promulgated a final rule implementing EO 13,658. *See Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634 (Oct. 7, 2014) (to be codified at 29 C.F.R. pt. 10). The rule defined a contract as "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," which includes "any . . . permits." 79 Fed. Reg. at 60,722. In response to public comments, the rule clarified that special use permits (SUPs) issued by the U.S. Forest Service (USFS), Commercial Use Authorizations (CUAs) issued by the National Park Service (NPS), and "outfitter and guide permit agreements" with the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service (USFWS), all qualified as contracts under EO 13,658. *See id.* at 60,652, 60,655.

In 2018, pursuant to his authority under FPASA, President Trump issued EO 13,838, *Exemption From Executive Order 13658 for Recreational Services on*

6

*Federal Lands*. *See* 83 Fed. Reg. 25,341 (May 25, 2018). EO 13,838 concluded that applying EO 13,658 to "outfitters and guides operating on Federal lands . . . does not promote economy and efficiency in making these services available to those" seeking to recreate on federal lands. *Id.* Because "[s]easonal recreational workers have irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate," EO 13,838 reasoned that a minimum wage "threatens to raise significantly the cost of guided" services and "would generally entail large negative effects on hours worked," thereby restricting access to recreation on Federal lands. *Id.* Therefore, EO 13,838 exempted from coverage under EO 13,658 "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on Federal lands." *Id.* However, the order specified that the "exemption shall not apply to lodging and food services associated with seasonal recreational services." *Id.* The DOL thereafter promulgated a final rule that implemented EO 13,838. *See Minimum Wage for Contractors*, 83 Fed. Reg. 48,537 (Sept. 26, 2018) (to be codified at 29 C.F.R. pt. 10).

On April 27, 2021, President Biden issued EO 14,026, *Increasing the Minimum Wage for Federal Contractors*, again pursuant to his authority under FPASA. *See* 86 Fed. Reg. 22,835 (Apr. 27, 2021) (to be codified at 29 C.F.R. pts. 10, 23). Set to begin on January 30, 2022, EO 14,026 raised the minimum wage specified under EO 13,658 to $15 per hour. *See id.* at 22,835–37. The order reflected President Biden's determination that "[r]aising the minimum wage enhances

worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.* at 22,835.

EO 14,026 also revoked EO 13,838, thereby eliminating the exemption from the minimum wage requirement for seasonal recreational service permittees. *See id.* at 22,836–37. As with EO 13,658, a contract falls within the scope of EO 14,026 only if (1) workers' wages under the contract "are governed by the Fair Labor Standards Act [("FLSA")], the Service Contract Act [("SCA")], or the Davis-Bacon Act [("DBA")], and (2) the contract is, as relevant here, "for services covered by the [SCA]" or is "entered into with the Federal Government in connection with Federal property or lands and related to offering services for . . . the general public." *Id.* at 22,837.

Following notice and comment, the DOL promulgated a final rule that implemented EO 14,026. *See Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021) (to be codified at 29 C.F.R. pts. 10, 23). Responding to comments from "stakeholders in the outdoor recreational industries," the rule clarified that, based on the DOL's "understanding" of these businesses, the minimum wage requirement applies to special use permits issued by the Forest Service, "CUA[s] . . . with the NPS, and "outfitter and guide permit agreements with the BLM and USFWS." *Id.* at 67,147–48. "The principal purpose of these legal instruments," according to the DOL, "seems to be furnishing services through the use of service employees," in which case they are covered under the SCA

and, thus, EO 14,026. *Id.* at 67,148. Alternatively, the DOL stated that Section 8(a)(i)(D) of EO 14,026 covers these instruments as agreements "with the Federal Government in connection with Federal property or lands and related to offering services for . . . the general public." *Id.* at 67,151.

The DOL's minimum wage rule also clarified that the FLSA's overtime pay requirement of at least one and one-half times an employee's normal rate, *see* 29 U.S.C. § 207(a), applies under EO 14,026 to "holders of CUAs issued by the NPS, and permits issued by the Forest Service, BLM and USFWS." 86 Fed. Reg. at 67,152.

Finally, in the rule, the DOL responded to comments asserting that, "unlike procurement contracts," licenses or permits for the provision of recreational services on federal lands "do not contain a mechanism by which the holder of the instrument can 'pass on' potential costs related to operation of the Executive order to contracting agencies," as well as comments asserting that the application of the minimum-wage requirement to "outfitter and guide permits would result in . . . business[es] needing to reduce employee work hours, reduce services, or increase prices." *Id.* Specifically, in responding, the DOL "recognize[d] and acknowledge[d] that there may be particular challenges and constraints experienced by non-procurement contractors that do not exist under more traditional procurement contracts." *Id.* But it "anticipate[d] that the economy and efficiency benefits of" a higher minimum wage would "substantially offset any potential adverse economic effects" by "reduc[ing] absenteeism and turnover in the workplace, improv[ing] employee morale and

productivity, reduc[ing] supervisory and training costs, . . . increas[ing] the quality of services provided to the Federal Government and the general public," and ultimately—by virtue of that increased quality—"attract[ing] more customers and result[ing] in increased sales." *Id.* at 67,152–53. Furthermore, the DOL reasoned that "[s]uch benefits may be realized even where the contractor has limited ability to transfer costs to the contracting agency or raise prices of the services that it offers." *Id.* at 67,153.

**B**

Plaintiff-Appellant AVA provides guided outdoor excursions in Colorado, and Plaintiff-Appellant Duke Bradford owns and operates AVA. Aplts.' App. at 13 ¶¶ 1, 3 (Compl., filed Dec. 7, 2021). AVA conducts some of its tours on federal land pursuant to two government permits. *Id.* at 13 ¶ 4. One is a "Special Recreation Permit" from BLM that authorizes fishing trips in Colorado. *Id.* Another is a special use permit from USFS for operations in the White River National Forest. *Id.* For overnight trips, AVA pays guides a trip salary rather than an hourly wage. *Id.* at 14 ¶ 6. If converted into an hourly rate, these salaries typically exceed $15 per hour. *Id.*; *see also id.* at 53 ¶ 5 (Decl. of Duke Bradford, filed Dec. 9. 2021). Accordingly, AVA pays its guides more than the minimum wage, which, in Colorado, is $12.56 per hour. *Id.* at 14 ¶ 6; *see also id.* at 170, Tr. 34:5–13 (Test. of Duke Bradford, Jan. 6, 2022). However, many guides work more than 40 hours per week, and "AVA's wages typically do not exceed the $15/hour threshold when including time-and-a-half overtime wages." *Id.* at 14 ¶¶ 6–7. As such, AVA alleges that it would incur

10

compliance costs and increased labor costs should EO 14,026 go into effect and it was accordingly "required to pay overtime, based on a \$15/hour minimum wage." *Id.* at 14 ¶ 7; *see id.* at 155–58, Tr. 19:22–22:2.

CROA is a trade association that represents the interests of its members, which consist of approximately fifty river-guide outfitters, including AVA. *See id.* at 55 ¶¶ 3, 6 (Decl. of David Costlow, filed on Dec. 7, 2021); Aplts.' Opening Br. at 11. Most of CROA's members operate on federal lands under special use permits. *See id.* at 55 ¶ 3. Like AVA, CROA's members typically pay their guides a flat fee on a per-trip basis. *Id.* at 55 ¶ 5. CROA alleges that "[i]ncreasing the wages for guides to \$15/hour and paying overtime based on that wage would dramatically alter the wage structure for many of CROA's members." *Id.* at 56 ¶ 7. CROA expects that the new minimum wage requirement will cause labor costs to increase for its members, which will cause members to raise prices and eliminate trips. *Id.* at 56 ¶¶ 7–8.

## C

Appellants filed a Complaint in the U.S. District Court for the District of Colorado on December 7, 2021, in which they challenged the DOL's rule implementing EO 14,026 and sought declaratory relief. *Id.* at 11–13. In Count I, they asserted that FPASA did not authorize the DOL's "rule," and therefore the rule violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), as "agency action . . . in excess of statutory . . . authority." *Id.* at 25–27 ¶¶ 51–59. In Count II, they asserted that the "rule" is "arbitrary and capricious," in violation of Section 706(2)(A). *Id.* at 27–28 ¶¶ 60–65. And, in Count III, they asserted that

because FPASA did not authorize the "rule," it violated the separation of powers, and even if FPASA did authorize the rule, the statute unconstitutionally delegated legislative power to the President and the DOL. *Id.* at 28–29 ¶¶ 66–77. Appellants then filed a Motion for a Preliminary Injunction. *Id.* at 31 (Mot. for Prelim. Injunc., filed Dec. 9, 2021).

After holding an evidentiary hearing, the district court denied Appellants' motion. *Id.* at 90, 136–37 (Dist. Ct. Order, filed Jan. 24, 2022). It first concluded that Mr. Bradford and AVA had Article III standing, but that CROA did not.[2] *Id.* at 101–05. The court then denied the Appellants' motion because it concluded that Appellants failed to demonstrate a "likelihood of success on the merits" on each of their claims. *Id.* at 121, 130, 135–36. It did not reach any of the other factors governing preliminary injunctions. *Id.* at 135. Appellants filed a notice of interlocutory appeal on January 26, 2022, and on February 28, 2022, the district court denied their motion for an injunction pending appeal.

---

[2]    Appellees do not dispute that Mr. Bradford and AVA have standing. Because at least one appellant has standing, we may consider this appeal. *See Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). Appellants nevertheless argue in a footnote that the district court erred in concluding that CROA does not have Article III standing. *See* Aplts.' Opening Br. at 13–14 n.1. However, "[a]rguments raised in a perfunctory manner, such as in a footnote, are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc). And we have applied the waiver doctrine from *Hardman* where a plaintiff challenged in a footnote the district court's conclusion that the plaintiff lacked standing. *See Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 793 n.5 (10th Cir. 2009). Accordingly, we conclude that Appellants waived their challenge concerning CROA's standing on appeal.

Appellants also filed a motion for an injunction pending appeal with this Court, which a two-judge panel granted on February 17, 2022. *See Bradford v. U.S. Dep't of Lab.*, No. 22-1023, at *1 (10th Cir., filed Feb. 17, 2022) (unpublished) [hereinafter "Motions Panel Order"]. Specifically, the motions panel enjoined the rule "in the context of contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands." *Id.* at 2. The rule had gone into effect on January 30, 2022, and, except as enjoined, remains in effect today.

## II

Appellants raise two overarching arguments on appeal. First, Appellants claim that the district court erred in concluding that they are unlikely to succeed on the merits of their claim that the DOL's minimum wage rule exceeded the authority granted under FPASA. *See* Aplts.' Opening Br. at 16–38. Second, they argue that the district court erred in concluding that they are unlikely to succeed on the merits of their claim that the rule is arbitrary and capricious. *See id.* at 38–48. As such, Appellants claim that the district court erred in denying their motion for a preliminary injunction.

After carefully considering the briefs and the parties' oral arguments, we conclude that the district court correctly denied Appellants' motion for a preliminary injunction. In reaching that conclusion, we first hold that Appellants have not shown a likelihood of success on the merits that the DOL's rule was issued without statutory

authority.  More specifically, the district court did not err in concluding that FPASA

likely authorizes the minimum wage rule because the DOL's rule permissibly

regulates the supply of nonpersonal services and advances the statutory objectives of

economy and efficiency.  Furthermore, we hold that Appellants have not

demonstrated a likelihood of success on the merits that the DOL's rule is arbitrary

and capricious.  Accordingly, we uphold the district court's order.

### III

"We review the district court['s] denial of a preliminary injunction for an

abuse of discretion."  *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d

1276, 1281 (10th Cir. 2016).  "An abuse of discretion occurs only when the trial

court bases its decision on an erroneous conclusion of law or where there is no

rational basis in the evidence for the ruling."  *Wilderness Workshop v. U.S. Bureau of*

*Land Mgmt.*, 531 F.3d 1220, 1223–24 (10th Cir. 2008) (quoting *Utah Licensed*

*Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1065 (10th Cir. 2001)).

To obtain a preliminary injunction, a "plaintiff must establish . . . (1) a

substantial likelihood of prevailing on the merits[,] (2) irreparable harm unless the

injunction is issued[,] (3) that the threatened injury outweighs the harm that the

preliminary injunction may cause the opposing party[,] and (4) that the injunction, if

issued, will not adversely affect the public interest."  *Diné*, 839 F.3d at 1281 (quoting

*Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).  "[B]ecause a preliminary

injunction is an extraordinary remedy, the [movant's] right to relief must be clear and

unequivocal."  *Wilderness Workshop*, 531 F.3d at 1224 (alterations in original)

(quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).  We "may affirm a district court decision 'on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.'"  *Dominion Video Satellite*, 269 F.3d at 1157 (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir.1994)).

## IV

### A

Appellants first argue that FPASA "only empowers the President to control the 'procur[ement] and supply[]' of nonpersonal services by '*the Federal Government*.'" Aplts.' Opening Br. at 18 (alterations in original) (quoting 40 U.S.C. § 101(1)). However, Appellants note that "the government does not supply the relevant recreational services" nor does it "procur[e] anything." *Id.*  Thus, Appellants assert that "[i]t makes no sense to adopt DOL's view that the agency can regulate a company, like AVA, [which] neither procures nor supplies any nonpersonal services to the government, just because AVA later supplies nonpersonal services to its customers." *Id.* at 19.  Appellants thus contend that the DOL's rule is not a permissible regulation under FPASA.  In our view, however, Appellants' argument is contrary to the plain text of FPASA.

FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act and that are "consistent with" the Act.  40 U.S.C. § 121(a).  "The purpose" of FPASA "is to provide the Federal Government with an economical and efficient system for . . . (1) *[p]rocuring and*

*supplying property and nonpersonal services* . . . (2) [u]sing available property[,] (3) [d]isposing of surplus property [, and] (4) [r]ecords management." 40 U.S.C. § 101 (emphasis added). Thus, as our precedent makes clear, the Act authorizes the President to issue "policies and directives" that are consistent with the statute's purposes—including regulating the supply of nonpersonal services. *See City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) (concluding that "Congress chose to utilize a relatively broad delegation of authority in [FPASA]" but that Congress "did instruct the President's exercise of authority should establish 'an economical and efficient system for . . . the procurement and supply' of property" (omission in original) (quoting 40 U.S.C. § 471 (2000), now codified as amended at 40 U.S.C. § 101)). Crucially, contrary to Appellants' assertions, § 101 of FPASA does not specify any particular entity that must receive the nonpersonal services to which it refers.

FPASA defines "nonpersonal services" as "contractual services designated by the Administrator of General Services, other than personal and professional services." 40 U.S.C. § 102(8). The Federal Acquisition Regulation (FAR), which heads of agencies—including the Administrator of General Services—promulgated pursuant to authority granted under FPASA, *see* 48 C.F.R. § 1.103(b); 40 U.S.C. § 121(c), explains the difference between "personal" and "nonpersonal" service contracts. *See also Kentucky v. Biden*, 23 F.4th 585, 604 n.11 (6th Cir. 2022) (citing FAR to delineate between "personal" and "nonpersonal" services contracts). "A personal services contract is characterized by the employer-employee relationship it

16

creates between the Government and the contractor's personnel."  48 C.F.R.

§ 37.104(a).  By contrast, a "[n]onpersonal services contract means a contract under

which the personnel rendering the services are not subject . . . to the supervision and

control usually prevailing in relationships between the Government and its

employees."  48 C.F.R. § 37.101.

Here, Appellants "supply[]" services, 40 U.S.C. § 101(1), through the guided

tours they offer.  And the government's provision of federal permits to Appellants is

a part of "an economical and efficient system" for supplying those nonpersonal

services to the public.  *Id*.  Indeed, the DOL's understanding of the contractual

arrangement is that outfitters enter into agreements with the BLM, and "[t]he

principal purpose of these legal instruments" is for the government to "furnish[]

services through the use of service employees."  86 Fed. Reg. at 67,148.

Furthermore, the permits the government issues to the outfitters contain terms

reflecting the government's "concern[] with the ways in which outfitters supply

recreational services to the public," such as the need for outfitters to "use hardened

trails within riparian areas" in order to avoid "damag[ing] the land."  *Bradford v.*

*U.S. Dep't of Lab.*, 582 F. Supp. 3d 819, 834 (D. Colo. Jan. 24, 2022); *see also*

Aplees.' Suppl. App. at 4–5 (AVA Special Recreation Permit Stipulations, dated June

16, 2014).

Moreover, as Mr. Bradford testified, AVA's permit with BLM prohibits AVA

from representing that BLM provides the guiding services customers receive from

AVA.  *See* Aplts.' App. at 148–49, Tr. 12:6–13:5 (Test. of Duke Bradford, dated Jan.

17

6, 2022); *id.* at 261 (BLM Special Recreation Permit, dated July 26, 2012).  Thus, in terms of the relationship between the government and AVA, the permit qualifies as a "nonpersonal services contract," as there is no direct employment relationship between BLM and AVA's guides.  48 C.F.R. § 37.101.  And § 101 of FPASA does not specify any particular entities that must receive the "nonpersonal services" to which it refers, thereby covering—as a textual matter—services Appellants supply to the public.  40 U.S.C. § 101.  Stated another way, there is no explicit requirement in § 101 that the government itself directly supply the property or services under FPASA.

Furthermore, Appellants' interpretation—*viz.*, that "supplying nonpersonal services" solely encompasses transactions in which a contractor provides services to the government—would render portions of FPASA superfluous.  Aplts.' Opening Br. at 19.  As Appellees argue, "[w]hen a contractor provides goods or services directly to the federal government, the government is 'procuring' those goods or services." Aplees.' Resp. Br. at 17.  If we interpret the statute such that a contractor is "supplying" services to the government when the government is simultaneously "procuring" those services, "supply[]" retains no meaning independent of "procur[e]."  40 U.S.C. § 101(1).  Indeed, doing so would violate the canon requiring "that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Rubin v.*

18

*Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (alteration in original) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).[3]

Thus, contrary to Appellants' assertions, "supplying . . . nonpersonal services" appears to encompass transactions in which a contractor provides services to the public. 40 U.S.C. § 101. As such, Appellants—through the guided tours they offer to the public—"supply[]" "nonpersonal services" within the meaning of FPASA. *Id*. Consistent with the language of FPASA and our precedent, then, the President "may prescribe policies and directives" regulating the supply of these nonpersonal services. 40 U.S.C. §§ 101, 121(a).[4]

Accordingly, Appellants are unlikely to succeed on the merits in showing that the DOL's rule is not a permissible regulation under FPASA. Stated another way,

---

[3]    To respond to this superfluity problem, Appellants offer a hypothetical involving campground services. They contend that the government may "supply" services by providing access to a federal campground while simultaneously "procuring" contractual services from a campground host. Aplts.' Opening Br. at 19–20; Aplts.' Reply Br. at 11–12. But this example fails to account for the definition of "nonpersonal services." *See* 40 U.S.C. § 102(8). If the government is "supplying" services directly by providing access to the campground, they are not supplying "nonpersonal services" because the services are not "contractual," *id.*, as they are not provided by a contractor.

[4]    Appellants contend that, if our interpretation were correct, it would be "difficult to imagine any economic transaction that falls outside the statute's reach." Aplts.' Opening Br. at 19. However, we note that the President's authority extends only to entities that contract with the federal government—*viz.*, the minimum wage rule applies to only those employees of a contracting entity who work on or in connection with a covered contract. *See* 86 Fed. Reg. at 22,835. As such, we are unpersuaded by Appellants' rhetoric that the authority exercised here would encompass all "economic transaction[s]." Aplts.' Opening Br. at 19.

there is a clear relationship between the statute conferring authority (i.e., FPASA) and the DOL's rule.

**B**

Next, Appellants contend that the "DOL's invocation of the Procurement Act cannot be justified." Aplts.' Opening Br. at 24. Specifically, Appellants assert that—under FPASA—the President's authority is "limited to actions that he considers 'essential' or 'indispensable' to provide the 'prudent use' of government resources 'without wasting materials.'" *Id.* at 23. Here, however, Appellants claim that the net result of the DOL's rule "will be *more* costs to the public, to non-procurement firms, and to the government—the opposite of a permitted action under [FPASA]." *Id.* at 24. Yet Appellants' argument lacks merit.

FPASA authorizes only "policies and directives that the President considers necessary" to "provide . . . an economical and efficient system for" procurement and supply. 40 U.S.C. §§ 101(1), 121(a); *see also City of Albuquerque*, 379 F.3d at 914; *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003). To fall within the authority granted, orders issued under FPASA must have a "'sufficiently close nexus' to the values of [economy and efficiency]." *Chao*, 325 F.3d at 366 (quoting *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Kahn*, 618 F.2d 784, 788, 792 (D.C. Cir. 1979)); *City of Albuquerque*, 379 F.3d at 914 (concluding that an executive order under FPASA must be "sufficiently related" to "establish[ing] 'an economical and efficient system'" for procurement and supply (quoting 40 U.S.C. § 471 (2000), currently codified at 40 U.S.C. § 101)).

20

Contrary to Appellants' interpretation, however, "'[e]conomy' and 'efficiency' are not narrow terms." *Kahn*, 618 F.2d at 789. "[T]hey encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.* The standard is a "lenient" one, and courts have respected the President's judgment as to how a given executive order is likely to advance the statute's objectives. *Chao*, 325 F.3d at 367.

Here, the DOL's rule has a "sufficiently close nexus" to the values of economy and efficiency. *Id.* at 366 (quoting *Kahn*, 618 F.2d at 792). According to the government, the DOL's rule "promotes economy and efficiency" by "enhanc[ing] worker productivity and generat[ing] higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835. Thus, even if the rule could plausibly increase costs for the government and the public, enhanced worker productivity and higher quality work—standing alone—are sufficient justifications to invoke FPASA. In other words, the President could consider the DOL's minimum wage rule necessary to "provide . . . an economical and efficient system for" procurement and supply. 40 U.S.C. § 101.

Indeed, the D.C. Circuit's decision in *Chao* supports our conclusion. There, the court upheld an executive order requiring federal contractors to notify employees of their rights not to join a union, on the basis of President Bush's judgment that "[w]hen workers are better informed of their rights, . . . their productivity is enhanced." *Chao*, 325 F.3d at 366. *Chao* reached this conclusion even though "[t]he

link may seem attenuated" and the order could have produced the "opposite effects or no effects at all." *Id.* at 366–67. Accordingly, here, like in *Chao*, President Biden could have determined that the DOL's rule advanced the statutory values of economy and efficiency by enhancing worker productivity, even if the rule could theoretically produce the opposite effects or no effects at all.

Furthermore, we could also uphold the DOL's rule under Appellants' stringent interpretation of economy and efficiency—*viz.*, the President must "show a 'nexus between the wage and price standards and likely savings to the Government.'" Aplts.' Opening Br. at 22 (quoting *Kahn*, 618 F.2d at 793). Here, the DOL "anticipates that the economy and efficiency benefits of [EO] 14[,]026 will offset potential costs." 86 Fed. Reg. at 67,152. Specifically, it expects that "reduc[ing] absenteeism and turnover in the workplace, improv[ing] employee morale and productivity, [and] reduc[ing] supervisory and training costs" "will substantially offset any potential adverse economic effects." *Id.* at 67,153. This analysis also applies to "permittees, licensees, and CUA holders"—such as AVA and other CROA members. *Id.* Admittedly, DOL concedes that permittees have a "limited ability to transfer costs to the contracting agency or raise prices of the services that [they] offer[]," which "may result in reduced profits in certain instances." *Id.* at 67,153, 67,206. However, DOL makes clear that such reduced profits will only occur when "none of the beneficial effects"—such as reduced absenteeism and improved productivity—"discussed in [DOL's] analysis appl[ies]." *Id.* at 67,206. Thus, even

under Appellants' interpretation, the DOL's rule has a sufficiently close nexus to the values of economy and efficiency.

Indeed, *Kahn*—i.e., the case that Appellants primarily rely upon to support their position—confirms our conclusion.  There, the D.C. Circuit upheld an executive order issued under FPASA that required federal contractors to comply with certain wage and price controls to curb inflation.  *See Kahn*, 618 F.2d at 785–86.  The court acknowledged that the order could cause the government to award contracts to higher bidders that complied with the controls over lower bidders that did not.  *See id.* at 792–93.  It nevertheless concluded that the order's controls would promote economy and efficiency by reducing the overall rate of inflation in government contracting, which would "likely have the direct and immediate effect of holding down the Government's procurement costs."  *Id.*  Similarly, here, the DOL's rule will cause the government to award federal permits to contractors that comply with the increased minimum wage requirements over those that do not.  Yet we defer to DOL's determination that such wage controls could promote economy and efficiency by reducing costs in the long-term.

Accordingly, Appellants are unlikely to succeed on the merits in showing that the DOL's rule lacks a sufficiently close nexus to the statutory objectives of economy and efficiency.

## C

Finally, Appellants request that we read FPASA narrowly and "construe any uncertainty in" their favor.  Aplts.' Opening Br. at 27.  Specifically, they claim that

FPASA (1) should not be read to displace other statutory schemes governing contractor wages, (2) should be read narrowly given its major economic impact, and (3) should be construed to avoid a non-delegation problem. *See id.* at 27–38. We address each argument in turn.

**1**

First, Appellants contend that a narrowing construction is appropriate given that other federal statutes explicitly impose a minimum wage for federal contractors—*viz.*, the Davis-Bacon Act (DBA), the Walsh-Healy Public Contracts Act (PCA), and the Service Contract Act (SCA). *See id.* at 29. More specifically, Appellants assert that Congress spoke directly in the DBA, PCA, and SCA "to the issue of whether federal contractors should be required to pay a minimum wage." *Id.* As such, they claim that "[i]t is 'implausible' that Congress meant to grant the President [through FPASA] the 'implicit power to create an alternative to the explicit and detailed [] scheme' that Congress set out in these statutes." *Id.* at 30 (quoting *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017)). We are unpersuaded.

Appellants primarily rely on *New Mexico v. Department of Interior* to support their argument. In *New Mexico*, we addressed whether a regulation promulgated by the U.S. Department of Interior (DOI) under the Indian Gaming Regulatory Act (IGRA) complied with the "explicit and detailed remedial scheme" outlined in the very same statute. 854 F.3d at 1226. The statutory scheme called for tribes and states to negotiate compacts permitting gaming on reservations, and it authorized

tribes to sue states in federal court when states failed to negotiate in good faith. *See id.* at 1211. If the court found that a state failed to negotiate in good faith, the statute then authorized the court to issue injunctive relief, after which the statute authorized the DOI to issue gaming procedures. *See id.* at 1212. But after Congress enacted the IGRA, the Supreme Court "made clear that a state can invoke sovereign immunity in response to such a suit." *Id.* at 1211 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 47 (1996)). In response to the Court's decision, DOI—pursuant to its alleged authority under the IGRA—issued a rule that prescribed the applicable gaming procedures for when a district court dismissed a tribe's suit based on sovereign immunity. *See id.*

*New Mexico* held that the DOI rule was unlawful because it deviated "in fundamental ways" from the "remedial scheme" Congress enacted in the IGRA. *Id.* at 1225–28. Specifically, we found "implausible the Secretary's assertion of implicit power to create an alternative to the explicit and detailed remedial scheme that IGRA prescribes." *Id.* at 1226.

However, the present matter is distinguishable. In *New Mexico*, the agency claimed authority under a particular statute—the IGRA—to issue rules in an area where *the very same statute* created its own "explicit and detailed remedial scheme." *Id.* Accordingly, we found it "implausible" that the IGRA would grant the agency "implicit power to create an alternative" procedure where the statute set out its own in such detail. *Id.* However, the DOL has claimed no such authority here. Specifically, it has not issued minimum wage rules under the authority of statutes

providing for their own statutory minimum wage schemes for federal contractors—
i.e., the DBA, PCA, and SCA. Rather, it has issued minimum wage rules under a
separate statute—FPASA—where the rules do not constitute an alternative regulatory
scheme. Accordingly, *New Mexico* has virtually nothing to say about the propriety of
the DOL's action here.

Furthermore, Appellants concede that the minimum wage rule issued pursuant
to FPASA does not "conflict[]" with the DBA, PCA, and SCA, as those statutes set
only minimum wage requirements—i.e., a floor below which wages are not allowed
to fall. Aplts.' Reply Br. at 15. Stated another way, the DBA, PCA, and SCA do not
preclude the higher-wage requirement issued here. Thus, this is not a case where we
must apply "the well-established principle that, when two statutes *conflict*, the
'specific governs the general.'" *R-S-C v. Sessions*, 869 F.3d 1176, 1184 (10th Cir.
2017) (emphasis added) (quoting *Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21
(2012)).

Similarly, Appellants fail to support any claim that the later-enacted SCA
(passed in 1965) displaces any authority to regulate contractor wages under FPASA
(passed in 1949). "The later statute displaces the first only when the statute
'expressly contradict[s] the original act' or if such a construction 'is absolutely
necessary . . . in order that [the] words [of the later statute] shall have any meaning at
all.'" *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996)
(alterations and omission in original) (quoting *Traynor v. Turnage*, 485 U.S. 535, 548
(1988)). Appellants make no such showing here.

Rather, Appellants contend that the issue is whether we should interpret FPASA to "broadly grant power over [federal contractor] wages" when it does not reference wages, and other statutes establish specific rules in this area. Aplts.' Reply Br. at 15. But Appellants do not cite to any provision in these statutes foreclosing the authority to set higher minimum wage requirements. And Congress frequently sets minimum requirements while expecting that other entities will adopt more stringent regulations. *See, e.g.*, *Union Elec. Co. v. Env't Prot. Agency*, 427 U.S. 246, 261–63 (1976) (holding that a provision of the Clean Air Act (CAA) authorized states to issue emissions regulations that are "more stringent" than national standards). Although states are often the actors that impose higher standards, the federal government does so too in certain circumstances, as envisioned in the Fair Labor Standards Act. *See* 29 U.S.C. § 218(a) ("No provision of this chapter . . . shall excuse noncompliance with any *Federal* or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter." (emphasis added)). Thus, contrary to Appellants' assertions, there is no indication here that Congress intended for any of the minimum wage statutes to preclude the payment of higher wages to employees working on or in connection with covered contracts. Accordingly, we are unwilling to apply a narrowing construction on this basis.

## 2

Next, Appellants contend that "the Procurement Act must be read narrowly given its major economic impact." Aplts.' Opening Br. at 32 (bold-face font

omitted).  Specifically, Appellants claim that the DOL's rule "'is economically significant,' since it would result in direct costs to employers of '$1.7 billion per year over 10 years.'"  *Id.* at 32–33 (quoting 86 Fed. Reg. at 67,194) (emphasis omitted).  Given its economic significance, Appellants contend that we "must meet DOL's rule 'with a measure of skepticism,' and look for a clear statement from Congress."  *Id.* at 33 (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 304 (2014)).  Appellants assert this is especially true given the DOL's "reed-thin" statutory argument.  *Id.*  We are unpersuaded.

Although courts generally "enforce plain and unambiguous statutory language according to its terms," *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010), "[w]here the statute at issue is one that confers authority upon an administrative agency," there are certain "'extraordinary cases' that . . . provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). In such cases, "the agency must . . . point to 'clear congressional authorization'" for the proposed regulation.  *Id.* at 723 (quoting *Util. Air*, 573 U.S. at 324).

In this vein, the so-called Major Questions Doctrine applies where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy'" or make "decisions of vast 'economic and political significance.'"  *Util. Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159–60).  In arguing that the Major Questions Doctrine applies,

Appellants focus on the economic effects of the broader minimum wage rule, which covers both non-procurement and procurement contractors. For the purposes of deciding this appeal, we will assume—without deciding—that Appellants framing of the specific "question" implicating the Major Questions Doctrine is correct.[5] Nonetheless, their argument is unavailing for four reasons.

First, this is not a case in which the executive branch seeks to locate expansive authority in "modest words," "vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see also West Virginia*, 597 U.S. at 724 (applying Major Questions Doctrine where the EPA claimed authority to "substantially restructure the American energy market" based on "an 'ancillary provision[]' of the [CAA]," which "was designed to function as a gap filler" (first

---

[5]        We note that Appellants' framing of the specific "question" implicating the Major Questions Doctrine may not be correct. In particular, the primary issue presented on appeal is whether FPASA grants authority to regulate non-procurement recreational service permittees, such as AVA and other CROA members. Yet, in arguing the Major Questions Doctrine applies, Appellants shift their focus to the economic effects of the broader minimum wage rule. This appears to be in tension with the Supreme Court's jurisprudence—which focuses on the effects of the challenged action to determine whether it presents a purportedly "major" question. *See Util. Air*, 573 U.S. at 312–14; *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231–32 (1994). If we were instead to frame the "major" question as DOL's authority to regulate *non-procurement permittees*, that would clearly not pose a question of "vast 'economic and political significance.'" *Util. Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 160). However, because the Appellees do not challenge the Appellants' framing of the question, we will assume that Appellants' framing is correct for purposes of resolving this appeal. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, . . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

alteration in original) (quoting *Whitman*, 531 U.S. at 468)).  Instead, as discussed *supra*, FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle," 40 U.S.C. § 121(a), which includes "provid[ing] the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services," 40 U.S.C. § 101(1).  In employing such expansive language, "Congress chose to utilize a relatively broad delegation of authority in the Federal Property and Administrative Services Act of 1949."  *City of Albuquerque*, 379 F.3d at 914.  Accordingly, the DOL's interpretation of FPASA does not involve "hid[ing] elephants in mouseholes." *Whitman*, 531 U.S. at 468.

Second, *Utility Air* makes clear that the Supreme Court's concern is with an "enormous and transformative expansion in . . . regulatory authority without clear congressional authorization."  573 U.S. at 324.  Here, however, EO 14,026 and the DOL's rule do not exercise the government's traditional "regulatory authority."  *Id*. Instead, they invoke the government's proprietary authority.  To be sure "[a]n exercise of proprietary authority can amount to a regulation if it seeks to regulate conduct unrelated to the government's proprietary interests."  *Georgia v. President of the U.S.*, 46 F.4th 1283, 1314 n.3 (11th Cir. 2022) (Anderson, J., concurring in part and dissenting in part); *see also Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 35 (D.C. Cir. 2002) (holding that an executive order "establish[ed] no condition that can be characterized as 'regulatory'" because it did not "address . . . projects unrelated to those in which the Government has a proprietary interest").  But here,

the DOL's rule relates to the government's proprietary interest in the "economical and efficient" procurement of services.  40 U.S.C. § 101(1).

"Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal."  *Perkins v. Luken Steel Co.*, 310 U.S. 113, 127 (1940).  Here, the challenged minimum-wage requirement does not apply to employers generally, or even to employees of covered employers who do not perform work on or in connection with federal contractors.  Instead, the rule simply reflects the President's management decision that the federal government will do business with companies only on terms he regards as promoting economy and efficiency.  More specifically, the President has determined that he will issue permits—granting access to federal lands for the supply of guided tours—to outfitters that comply with the minimum wage rule, which he deems necessary to carry out the objectives of economy and efficiency.  This exercise of proprietary authority is entirely within the bounds of the President's authority.  *See NASA v. Nelson*, 562 U.S. 134, 148 (2011) (noting that when the government acts "in its capacity 'as proprietor' and manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'" (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961))).

Third, even assuming DOL is exercising significant regulatory authority, the Supreme Court has typically applied the Major Questions Doctrine where an "agency claim[ed] to discover" regulatory authority for the first time "in a long-extant statute."  *Util. Air*, 573 U.S. at 324; *see id.* ("When an agency claims to discover in a

long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." (citation omitted) (quoting *Brown & Williamson*, 529 U.S. at 159)); *Biden v. Nebraska*, 600 U.S. ----, 143 S. Ct. 2355, 2372 (2023) ("The Secretary has never previously claimed powers of this magnitude under the HEROES Act.").

By contrast, over the decades since it was enacted, presidents have issued numerous executive orders under FPASA that regulate federal contractors to promote economy and efficiency in procurement and supply. Most relevant here, presidents during the past three administrations have issued executive orders under FPASA that imposed minimum wage requirements for federal contractors. *See* EO 13,658 (Feb. 12, 2014), 79 Fed. Reg. 9851; EO 13,838 (May 25, 2018), 83 Fed. Reg. 25,341 (amending EO 13,658 to exempt recreational service workers without otherwise revoking the minimum wage requirement and determining that the minimum wage requirement still applied to "lodging and food services associated with seasonal recreational services"); EO 14,026 (Apr. 27, 2021), 86 Fed. Reg. 22,835 (imposing an increased minimum wage for federal contractors and rescinding the exemption for recreational service workers).

Furthermore, beyond the specific context of a minimum wage, presidents have issued—and courts have upheld—a wide range of orders under FPASA governing federal contractors and their workers, often without a direct connection to cost reduction. *See, e.g.*, *Chao*, 325 F.3d at 362, 366–67 (upholding 2001 executive order requiring federal contractors to notify employees of certain labor rights); *Kahn*, 618

32

F.2d at 796 (upholding 1978 executive order regulating contractor prices and wages); *Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 170–71 (3d Cir. 1971) (addressing 1969 executive order imposing affirmative action and non-discrimination requirements on certain federal contractors and concluding that FPASA authorized the order, partly because it helped prevent contractors from overcharging the government).  These examples illustrate that unlike *West Virginia*, *Utility Air*, and *Brown & Williamson*, here the President did not "'claim[] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'"  *West Virginia*, 597 U.S. at 724 (second alteration in original) (quoting *Util. Air*, 573 U.S. at 324).  Instead, consistent with longstanding historical practice, the President issued yet another executive order under FPASA that regulated federal contractors to promote economy and efficiency in procurement and supply.[6]

---

[6]      *Kentucky* is distinguishable for similar reasons.  There, the Sixth Circuit applied the Major Questions Doctrine in holding that FPASA did not authorize an executive order requiring employees of federal contractors to become vaccinated against COVID-19.  *See Kentucky*, 23 F.4th at 589, 604, 606–08.  Without a clear statement from Congress, *Kentucky* refused to interpret FPASA as authorizing the President "to effect major changes in the administration of public health," a "purpose never-before recognized."  *Id.* at 607.  But *Kentucky* explicitly distinguished orders pertaining to "wage and price controls," non-discrimination, and labor rights, which "ha[ve] a 'close nexus' to the ordinary hiring, firing, and management of labor."  *Id.* at 607–08 (quoting *Kahn*, 618 F.2d at 792).  The court reasoned that "none of those [rationales] comes even *close* to [mandating] a medical procedure for one-fifth (or more) of our workforce," which it deemed an unprecedented assertion of authority under FPASA.  *Id.*

Here, however, three presidential administrations have imposed a minimum wage rule under FPASA, and the rule falls far closer than a vaccine mandate to the

Moreover, this is not a case in which the agency issuing the minimum wage rule lacks "expertise" in the relevant area of policymaking. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 486 (2015) ("It is especially unlikely that Congress would have delegated [a decision regarding the availability of tax credits for use on health insurance exchanges] to the IRS, which has no expertise in crafting health insurance policy of this sort."); *Gonzales v. Oregon*, 546 U.S. 243, 265–67 (2006). Clearly, DOL does not lack "expertise" in setting minimum wages for federal contractors. Indeed, Congress delegated this very responsibility to DOL in a related context. *See Int'l Bhd. of Elec. Workers, Loc. 113 v. T&H Servs.*, 8 F.4th 950, 953–54 (10th Cir. 2021) (discussing DOL's role in determining a prevailing wage under the Davis-Bacon Act).

Thus, given that this case differs markedly from those in which the Supreme Court applied the Major Questions Doctrine, we decline to apply that doctrine here.

**3**

Finally, Appellants argue that we must read FPASA narrowly to avoid the constitutional question of whether the statute impermissibly delegates legislative authority. *See* Aplts.' Opening Br. at 34–38. More specifically, Appellants claim that "an interpretation of the Procurement Act that allowed the President to unilaterally displace existing minimum wage rules for employers who merely have a

---

orders governing "management of labor," such as "wage and price controls," *id.* at 607, that administrations have imposed since Congress enacted FPASA. As such, we think the rationale underlying *Kentucky* is inapplicable here.

special use permit" would raise a nondelegation concern. *Id.* at 35 (emphasis omitted).  We conclude that no such concerns arise here.

"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," we must "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).  Under the "nondelegation doctrine," which is "rooted in the principle of separation of powers that underlies our tripartite system of Government[,] . . . Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989).  We therefore must interpret FPASA in a manner that does not "raise serious" questions under the nondelegation doctrine.  *DeBartolo*, 485 U.S. at 575.

"[A] delegation is constitutional so long as Congress has set out an 'intelligible principle' to guide the delegee's exercise of authority." *Gundy v. United States*, 588 U.S. ----, 139 S. Ct. 2116, 2129 (2019) (plurality opinion) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).  The Supreme Court "[has] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).  It has struck down statutory provisions under the nondelegation doctrine "[o]nly twice in this country's history[,] . . . in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy*, 139 S.

35

Ct. at 2129 (quoting *Mistretta*, 488 U.S. at 373 n.7); *see also United States v. Rickett*, 535 F. App'x 668, 674–75 (10th Cir. 2013) (explaining that "[b]etween 1789 and 1935—a period spanning 146 years of constitutional history—the Supreme Court 'never struck down a challenged statute on delegation grounds,'" and that it has done so only twice since, both times in 1935 (quoting *Mistretta*, 488 U.S. at 373)).[7]  And the Court has approved at least arguably broad delegations requiring agencies to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), to set prices that in an agency administrator's "judgment will be generally fair and equitable," *Yakus v. United States*, 321 U.S. 414, 421–22, 427 (1944), and to set air quality standards that are "requisite to protect the public health,'" *Whitman*, 531 U.S. at 472 (quoting 42 U.S.C. § 7409(b)(1)).

Appellants' nondelegation challenge is untenable under these precedents.  For example, in *Whitman*, a provision of the CAA provided an intelligible principle by merely delegating authority to set air quality standards that, "in the judgment of the [EPA] Administrator" and in conformity with certain statutory criteria, "are *requisite* to protect the public health."  531 U.S. at 472 (emphasis added) (quoting 42 U.S.C. § 7409(b)(1)).  The term "requisite" channeled agency discretion because the term authorized only actions taken to protect public health that are "sufficient, but not more than necessary."  *Id.* at 473.  Similarly, FPASA only authorizes executive

---

[7]      Recognizing that this unpublished decision is not binding on us, we rely on it for its persuasive value.  *See, e.g.*, *United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

orders that "the President considers *necessary*" to promote an "*economical*" and "*efficient*" system for procuring and supplying goods and services. *See City of Albuquerque*, 379 F.3d at 914 n.6. These italicized terms likewise channel executive discretion because they encompass only actions that the President considers necessary to increase productivity or quality of service in procurement and supply with little or no waste.

This analysis is also consistent with our precedent. In *City of Albuquerque*, a city brought a challenge under the Administrative Procedure Act arguing that the Department of Interior violated an executive order issued pursuant to FPASA by selecting office space in a manner that conflicted with procedures dictated under the order. *See* 379 F.3d at 904–05, 913. To establish prudential standing, the city had to demonstrate that it was "within the 'zone of interests' of a statute supporting standing under the [APA]." *Id.* at 913.[8] Because neither the executive order nor FPASA provided an explicit right of action, the city needed to establish that the executive order had a "statutory foundation," in which case "it is given the effect of a congressional statute." *Id.* (quoting *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997)).

---

[8]    Since we decided *City of Albuquerque*, the Supreme Court has clarified that "the zone of interests test is not prudential in origin and is indeed not a standing inquiry at all." *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020). However, this clarification has no material relevance to our analysis here of Appellants' nondelegation challenge.

We concluded that FPASA "provide[d] a sufficient statutory foundation for [the executive order]." *Id.* at 914. As we explained, "Congress may delegate responsibility to the executive branch so long as Congress provides an 'intelligible principle' to guide the exercise of the power." *Id.* (quoting *J.W. Hampton*, 276 U.S. at 409). We recognized that Congress used "a relatively broad delegation of authority in [FPASA]," but we explained that Congress "instruct[ed] the President's exercise of authority should establish 'an economical and efficient system for . . . the procurement and supply' of property." *Id.* (quoting 40 U.S.C. § 471 (2000), currently codified at 40 U.S.C. § 101)). And we concluded that directions in the executive order "concerning the consideration of locations within [a] central business area are sufficiently related to [FPASA] to be a valid exercise of the Act's delegated authority." *Id.* In so holding, we recognized that FPASA provides an "intelligible principle" by only authorizing actions that promote economy and efficiency in procurement and supply. *See id*. at 914–15.[9]

---

[9]    Appellants attempt to distinguish *City of Albuquerque*, claiming that we "upheld [FPASA] against a delegation challenge *because* the economy and efficiency limits meaningfully cabined the President's authority." Aplts.' Reply Br. at 21. But *City of Albuquerque* found no delegation concern with an executive order governing office-site selection that had no obvious connection to cost reduction. *See* 379 F.3d at 905, 914–15 (addressing order requiring agencies to prioritize central business districts in selecting office space, without any mention of reducing costs). Appellants do not explain why FPASA "meaningfully cabined the President's authority" in connection with that order but fails to do so in connection with the minimum wage rule. Aplts.' Reply Br. at 21.

Thus, given the clear guidance of our precedent, we must conclude that the rule at issue here does not present any nondelegation concerns.

\*\*\*

Accordingly, for the foregoing reasons, we hold that Appellants have not shown a likelihood of success on the merits that the DOL's rule was issued without statutory authority.  More specifically, the district court did not err in concluding that FPASA likely authorizes the minimum wage rule because the DOL's rule permissibly regulates the supply of nonpersonal services and advances the statutory objectives of economy and efficiency.

## V

Next, Appellants challenge the DOL's minimum wage rule as arbitrary and capricious due to three purported defects in its rescission of the exemption for recreational services: *first*, because it failed to "consider[] alternatives" to rescinding the exemption; *second*, because it rescinded the exemption "without acknowledging the significant reliance interests at stake"; and *third*, because it failed to explain why it "disregarded its own prior conclusions" pertaining to the exemption.  Aplts.' Opening Br. at 40.  We reject each of these contentions in turn.

We must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A rule is "arbitrary and capricious if the agency . . . relied on factors . . . Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). We may rely only on explanations "articulated by the agency itself." *Id.* at 50.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). But "when an agency rescinds a prior policy[,] its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ----, 140 S. Ct. 1891, 1913 (2020) (second and third alteration in original) (quoting *State Farm*, 463 U.S. at 51). And the agency "must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino*, 579 U.S. at 221–22).

As a starting point, we note that the most fundamental difficulty with Appellants' argument is that the rescission of the 2018 exemption could not have been an arbitrary and capricious exercise of agency discretion because the agency had *no discretion* to act otherwise. Specifically, the agency was compelled by the 2021 executive order to rescind the 2018 executive order, which created the exemption. *See* 86 Fed. Reg. at 22,836–22,837. Indeed, as DOL explained, to maintain the exemption would have been "in clear derogation of both the letter and spirit" of the 2021 order. 86 Fed. Reg. at 67,154. And Appellants do not dispute that

the 2021 order required DOL to eliminate the exemption for recreational service and equipment providers.[10]

As such, Appellants cannot be correct in stating that it was arbitrary and capricious for DOL not to consider alternatives to the rule it adopted or to acknowledge the significant reliance interests at stake. As noted above, the 2021 executive order specifically rescinded the 2018 exemption and thus left DOL no discretion to consider maintaining it. Thus, it would have been futile for DOL to have considered comments advocating alternatives that it lacked discretion to adopt. In other words, to consider and adopt any such alternatives would require DOL to defy an executive order—which would clearly constitute an arbitrary and capricious agency action. *See, e.g.*, *Delgadillo v. Astrue*, 601 F. Supp. 2d 1241, 1248 (D. Colo. 2007) ("[A]n executive order dictates an agency's policy unless or until Congress enacts a statutory policy."); 5 U.S.C. § 706(2)(A) (requiring courts to set aside agency actions that are "not in accordance with law").

Furthermore, Appellants mistakenly rely on *Regents* for their position that the APA required the DOL to consider exempting recreational service permittees, and any reliance interests the previous exemption engendered among such permittees— notwithstanding an executive order that explicitly rescinded the exemption. *See*

---

[10]    Appellants have not challenged the 2021 executive order, likely because they realize "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). As such, we cannot review— under APA standards—whether the 2021 executive order itself adequately justified the policy change that it effected.

41

Aplts. Opening Br. at 42, 46–47.  In *Regents*, the Supreme Court reviewed the
rescission of the Deferred Action for Childhood Arrivals (DACA) program by the
Acting Secretary of Homeland Security.  140 S. Ct. at 1901.  The Court held that the
Acting Secretary's decision was arbitrary and capricious because she "did not appear
to appreciate the full scope of her discretion." *Id.* at 1911.  In particular, the Court
concluded, the Acting Secretary failed to "consider[]" alternative means of winding
down the DACA program. *Id.* at 1915.

Here, however, the present matter differs from *Regents* in one critical respect.
Specifically, unlike the Secretary in *Regents*, the DOL did not possess the relevant
discretion; instead, Congress committed to the President himself, not to an agency,
the determination of what "policies and directives" to "prescribe" for federal
contracting.  40 U.S.C. § 121(a).  Thus, *Regents* does not support Appellants'
position. *See* 140 S. Ct. at 1910; *cf. id.* (emphasizing "an important constraint on [the
Acting Secretary of DHS's] decisionmaking authority—she was *bound* by the
Attorney General's legal determination").

Finally, Appellants contend that the DOL acted arbitrarily and capriciously in
failing to explain why it "disregarded its own prior conclusions" as to the exemption
for recreational services.  Aplts.' Opening Br. at 40.  Specifically, they claim the
DOL failed to engage "with President Trump's findings that applying a minimum
wage rule to outfitters and guides . . . would threaten 'to raise significantly the cost of
guided hikes and tours on Federal lands' . . . and 'would [negatively affect] . . . hours
worked by recreational service workers.'" *Id.* (quoting 83 Fed. Reg. at 25,341).

42

They also claim the DOL did not "acknowledge its *own* prior findings" that exempting permittees could lower their cost of business, "which 'could incentivize small outfitters to enter the market,' 'incentivize existing outfitters to hire more guides' . . . and provide 'more affordable guided tours . . . [on] Federal lands.'" *Id*. at 40–41 (quoting 83 Fed. Reg. at 48,540).

Again, we question whether the DOL was required to provide such an explanation—given that it had no discretion to act otherwise. But, in any event, the rule explicitly addressed "comments regarding the financial impact of [EO 14,026]" on "seasonal recreational businesses." 86 Fed. Reg. at 67,152. These commenters represented that the minimum wage "would result in their business[es] needing to reduce employee work hours, reduce services, or increase prices," thereby restricting access to services on federal lands. *Id.* In response to these comments, the DOL "recognize[d] and acknowledge[d] that there may be particular challenges and constraints experienced by non-procurement contractors," including businesses offering services on federal lands pursuant to permits, "that do not exist under more traditional procurement contracts." *Id.* One particular challenge the DOL recognized is that "[n]on-procurement . . . contractors cannot as directly pass [increased] costs" resulting from a higher minimum wage "along to the Federal Government in the form of an increased bid amount or similar charge for the next contract." *Id.* at 67,206.

Notwithstanding these challenges, the DOL "anticipate[d] that the economy and efficiency benefits of [EO 14[,]026 will offset potential costs." *Id.* at 67,152. The DOL emphasized, in particular, "that increasing the minimum wage . . . can

43

reduce absenteeism and turnover in the workplace, improve employee morale and productivity, reduce supervisory and training costs, and increase the quality of services provided to the Federal Government and the general public." *Id.* at 67,153. It also noted that "increased efficiency and quality of services" have the potential to "attract more customers and result in increased sales." *Id.* The DOL recognized that, "[i]n limited cases," an inability to pass labor-cost increases through to the Federal government "may result in reduced profits in certain instances," but only "assuming that none of the beneficial effects . . . discussed [*supra*] apply." *Id.* at 67,206. We conclude that the DOL's detailed explanation clearly satisfies (assuming that it must do so) the requirement that, when an agency changes its policy, it must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino*, 579 U.S. at 221 (quoting *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). As such, we conclude that Appellants have not shown a substantial likelihood of success on the merits that the DOL's rule is arbitrary and capricious.

## VI

For the foregoing reasons, we **AFFIRM** the district court's order denying Appellants' motion for a preliminary injunction.[11]

---

[11]    Without objecting to Safari Club's filing of its amicus brief, Appellees move to strike declarations filed with the brief because the declarations include evidence that was not submitted to the district court. *See* Aplees.' Resp. to Safari Club Int'l [hereinafter "Aplees.' Mtn. to Strike"] at 1 (citing *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1195 n.7 (10th Cir. 2008)). However, the declarations Appellees move to strike simply support points made in Safari Club's brief, and

---

Appellees do not oppose the brief itself.  Accordingly, we are hard pressed to see how Appellees are harmed by the filing of the declarations.  Moreover, we accord no material significance to the declarations that goes beyond any that we attach to the averments of Safari Club's brief.  Therefore, at least under these unique circumstances, we do not see any legal impediment to our consideration of the "extra-record evidence" attached to Safari Club's brief, insofar as it contains "matters relevant to the disposition of this case."  *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1175–76 (10th Cir. 2021).  Accordingly, we **deny** Appellees' motion to strike.

No. 22-1023, *Bradford v. U.S. Dep't of Labor*
**EID**, J., dissenting.

Only Congress can wield legislative power.  U.S. Const. art. I, § 1.  Yet the law here, by lacking an intelligible principle, delegates just that to the President.  The Federal Property and Administrative Services Act ("FPASA") grants the President nearly unfettered power to create any policy he considers necessary to carry out nonpersonal services under the guise of economy and efficiency.  In granting this power, Congress did not (1) require the President to conduct any preliminary factfinding or to respond to a specified situation.  Nor did Congress (2) provide the President a standard that sufficiently guides his broad discretion.  Accordingly, I would hold that the FPASA runs afoul of the nondelegation doctrine.  Because the majority holds otherwise, I respectfully dissent.[1]

## I.

Under the nondelegation doctrine, Congress must cabin its delegation of legislative authority to the President with an "intelligible principle."  *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality) (citation omitted).  The Supreme Court has identified an intelligible principle as falling into either of the "two buckets" identified

---

[1] Because I would hold the FPASA unconstitutional under the nondelegation doctrine, I also respectfully decline to join the majority on whether the Department of Labor's conduct (1) exceeded the authority granted under the FPASA or (2) was arbitrary and capricious under the FPASA.  *See* Maj. Op. at Parts IV–V.  Given that I would hold that the FPASA is invalid in itself, I would go no further into how the Department of Labor used the invalid delegation of power.  That said, I note that it would be hard to imagine any scenario where an agency rule exceeds the FPASA's vast grant of power after the President uses "econom[y]" and "efficien[cy]" as the justifications of executive action.  40 U.S.C. § 101(1).

in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935): "(1) whether the Congress has required any finding by the President in the exercise of the authority, and (2) whether the Congress has set up a standard for the President's action." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 773 (6th Cir. 2023) (Nalbandian, J., dissenting) (internal quotation marks and citation omitted), *petition for cert. filed*, (U.S. Jan. 30, 2024) (No. 23-819); *see id.* at 769–76 (explaining the original meaning of Article I and over two centuries of Supreme Court precedent on the nondelegation doctrine).

Under the first "bucket," a law must contain a situational or fact-finding requirement. *Panama Refin.*, 293 U.S. at 415 (considering "whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition"). In many cases, the Supreme Court has upheld laws if executive action can only come about as a response to certain situations. *See, e.g.*, *Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Lab.*, 312 U.S. 126, 145 (1941) (concerning a law conditioning the executive's ability to fix minimum wages on "basic facts to be ascertained administratively" and on "factors to be considered in arriving at these determinations"); *Radio Corp. of Am. v. United States*, 341 U.S. 412, 416 & n.5 (1951) (concerning a law requiring "a justifiable fact situation" before a commission could "promulgate standards for transmission of color television").

Under the second, a law must contain "a standard" limiting executive discretion. *Panama Refin.*, 293 U.S. at 415 (considering "whether the Congress has set up a standard for the President's action"). Some laws delegate to the executive the ability to "fill up the

2

details" in "general provisions." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). Even so, the Supreme Court has required that Congress provide a "sufficiently definite and precise" standard that can "enable Congress, the courts and the public to ascertain whether the [Executive official] . . . has conformed to those standards." *Yakus v. United States*, 321 U.S. 414, 426 (1944); *see Opp Cotton Mills*, 312 U.S. at 144.  Only then could a court be confident of what "general policy" a delegee "must pursue" and the "boundaries of [his] authority." *Gundy*, 139 S. Ct. at 2129 (plurality) (alteration in original) (citation omitted).  Because if not—if "an absence of standards" makes it "impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed"—a nondelegation violation occurs. *Yakus*, 321 U.S. at 426.

Such permissible, testable standards have taken the form of mandatory "factors" that the executive must conform to in acting. *Mistretta v. United States*, 488 U.S. 361, 374–76 (1989) (concerning a law requiring the Sentencing Commission to consider "seven factors," a "specific tool" of the "guidelines system," "three goals," "four 'purposes,'" and "prohibited" factors (citation omitted)); *see, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940) (concerning a law requiring the executive to consider "criteria" before taking any action); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (same); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 204, 225–26 (1943) (same); *Yakus*, 321 U.S. at 419, 427 (same); *Touby v. United States*, 500 U.S. 160, 166–67 (1991) (same); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001) (same).

Lastly, the Supreme Court has noted that the more power a law delegates, the more the law must limit that delegation.  Indeed, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475; *see Wayman*, 23 U.S. (10 Wheat.) at 43 ("To determine the character of the power given to the Courts by the Process Act, we must inquire into its extent."); *cf. Gundy*, 139 S. Ct. at 2125–30 (plurality) (stating that a narrow delegation that granted "only temporary authority" "was a stopgap, and nothing more"); *Yakus*, 321 U.S. at 419, 426 (involving "temporary wartime" measures).

The bottom line is that courts must examine statutes for an intelligible principle. That is because a law delegating power must have one to withstand Article I.  As aptly summarized from "over two centuries worth of caselaw," looking for an intelligible principle in turn "requires a court to analyze a statute for two things:  (1) a fact-finding or situation that provokes executive action or (2) standards that sufficiently guide executive discretion—keeping in mind that the amount of detail governing executive discretion must correspond to the breadth of delegated power."  *Allstates Refractory Contractors, LLC*, 79 F.4th at 776 (Nalbandian, J., dissenting) (cleaned up).

## II.

Neither this Court nor the Supreme Court have decided whether the FPASA violates the nondelegation doctrine.  The FPASA provides that the President "may prescribe policies and directives that [he] considers necessary to carry out" the FPASA that are "consistent with" the FPASA.  40 U.S.C. § 121(a).  Along those lines, a policy objective in the FPASA's purpose statement seeks to:  "provide the Federal Government

4

with an *economical* and *efficient* system for . . . [p]rocuring and supplying property and nonpersonal services." *Id.* § 101(1) (emphases added).

That is it.  That is all the FPASA gives us—no floor of what specific situations must arise, no ceiling on what the President may find economical or efficient to do. Instead, the FPASA gives the President nearly unfettered power to regulate any nonpersonal service via any contract-like instrument, not limited to a permit like in this case.  And with that permit or other instrument in hand, the President may do whatever he finds necessary to regulate entire industries in the name of what he believes to be economical and efficient.  Such a broad delegation without limits cannot stand under Article I.  Yet that is exactly the type of delegation we deal with today.

I fully acknowledge that the Supreme Court's body of caselaw for what makes an intelligible principle is "not demanding." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020) (Smith, J.) (quoting *Gundy*, 139 S. Ct. at 2129 (plurality)).  But even under those standards, I would hold that the FPASA violates the nondelegation doctrine because it lacks an intelligible principle.  That is because the FPASA provides no (1) fact-finding or situational requirement that prompts executive action.  Nor does it provide a (2) standard that sufficiently guides the President's discretion on what he finds economically or efficiently necessary.  Especially when considering the broad scope of power that the FPASA delegates—the ability to regulate *any* industry of someone who has a contract-like instrument with the federal government—Congress did not sufficiently limit executive discretion.

5

**A.**

My analysis on the first category of what makes an intelligible principle will be quick.  That is because the FPASA does not require the President to conduct any fact-finding or wait for any situation to occur before he "may prescribe policies and directives that [he] considers necessary."  40 U.S.C. § 121(a); *see Schechter Poultry*, 295 U.S. at 541–42; *Panama Refin.*, 293 U.S. at 417–18, 430.  The FPASA provides no requirement to "obtain[] needed data," no need to determine "the facts justifying" any changes.  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 405 (1928); *see Opp Cotton Mills*, 312 U.S. at 145 (finding an intelligible principle because, in addition to requiring the executive to consider certain "factors," the law required "basic facts to be ascertained administratively").  Nor does the President need to wait till he can respond to "a justifiable fact situation."  *Radio Corp. of Am.*, 341 U.S. at 416.

In contrast, he "may prescribe policies or directives" he "considers necessary to carry out" the "[p]rocuring and supplying" of "nonpersonal services" or other "related functions."  40 U.S.C. §§ 101(1), 121(a).  *When* he "may" act lies solely within his own discretion, *id.* § 121(a), for he "may accept, modify, or reject them as he pleases."  *Schechter Poultry*, 295 U.S. at 539.  No threat to an "economical and efficient system" of any "function" related to "[p]rocuring and supplying . . . nonpersonal services" needs to arise before the President can do what he believes necessary.  40 U.S.C. § 101(1).  And even if such a threat came about, the FPASA explains that the President "may," not shall, "prescribe policies and directives."  *Id.* § 121(a).  Thus, nothing requires the President to prescribe any policy or directive in response.  *Id.*; *see* Antonin Scalia & Bryan A. Garner,

*Reading Law: The Interpretation of Legal Texts* 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive[.]").  Thus, without anything occurring beforehand, the FPASA provides an open invite for the President to do whatever he "considers necessary" to regulate entire industries via a contract or a contract-like instrument, like the permit in this case.  40 U.S.C. § 121(a).

The FPASA then does not have an intelligible principle under the first category, as it does not contain a fact-finding or situation requirement.

**B.**

Nor does the FPASA contain a sufficient standard.  Given the broad delegation of power at issue here, the FPASA does not contain standards that sufficiently limit the President's discretion.  Indeed, we need only compare the statute here with those in other nondelegation cases to make that conclusion.

I start with what the FPASA does have:  Only two provisions may possibly serve as the basis for a standard.  To begin, there is the provision delegating authority to the President.  Section 121(a) of the FPASA makes it clear that the "President may prescribe policies and directives that the President considers necessary to carry out" the FPASA that are also "consistent with" the FPASA.  *Id.*  And working in conjunction with that provision, the FPASA also has a purpose statement containing a broad policy objective— a goal to provide the Federal Government with an "economical" and "efficient" system for activities, which include "[p]rocuring and supplying . . . nonpersonal services."  *Id.* § 101(1).  Taken together, the President may do what he finds necessary to carry out the

FPASA as long as he thinks the federal government would have an economical or efficient system.

That is not a standard. If *Panama Refining* and *Schechter Poultry* stand for anything, it is that a "general outline of policy," *Panama Refin.*, 293 U.S. at 417, or "statement of [] general aims," *Schechter Poultry*, 295 U.S. at 541, cannot form an intelligible principle without additional limits. "[S]uch a preface of generalities as to permissible aims," without more, is a "delegation of legislative power [] unknown to our law," "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537. And here, the FPASA provides nothing more.

Appellees argue that the President is bound by the FPASA's purpose statement, which states that he can only "provide the Federal Government with an economical and efficient system." 40 U.S.C. § 101. Importantly, *nowhere* in the FPASA does it require that the President *only* make regulations that are "economical and efficient" by some *objective* standard. *Id.* Indeed, the FPASA ensures that the President need only take his own *subjective* opinion into account. *Id.*

Again, the FPASA allows the President to take any measures "*that the President considers* necessary to carry out" the FPASA. *Id.* § 121(a) (emphasis added). This phrase places all discretion in the President's hands, requiring nothing and no one else to constrain what he "*considers* necessary." *Id.* (emphasis added). Along those lines, although the FPASA defines some terms, *see id.* § 102, the law does not define what "economical" and "efficient" mean, *id.* § 101. It instead leaves the defining to the President. *See id.* § 121(a).

What is worse, the FPASA also specifies that the "purpose" of the law "is to provide *the Federal Government*" with a "system." *Id.* § 101. Critically, the FPASA does not serve anyone or anything else but the federal government. What seems "economical" and "efficient" is not just left to the President's subjective opinion but is always in the federal government's best interest because the FPASA does not require the President to consider how river rafters, a state, or any private citizen may view what is "economical" and "efficient." *Id.* § 101. It only requires him to consider what he alone considers necessary to benefit himself or other parts of the federal government. *Id.* § 121(a).

Accordingly, the FPASA provides no objective "criterion" that the President "must conform to," *Sunshine Anthracite Coal Co.*, 310 U.S. at 397–98, no mandatory or prohibited "factors" that he must consider when creating a policy or directive, *Mistretta*, 488 U.S. at 375–76; *cf. Touby*, 500 U.S. at 167 (holding that the "multiple specific restrictions on the Attorney General's discretion . . . satisfy the constitutional requirements of the nondelegation doctrine"). The lack of some objective basis to turn to means that practically speaking, nothing limits the "breadth of the [President's] discretion" or narrows the "wide field of legislative possibilities" to which the FPASA can extend. *Schechter Poultry*, 295 U.S. at 538. Nothing requires him to use any basis for determining what he "may . . . consider[]" "economical" or "efficient." 40 U.S.C. §§ 101, 121(a); *see Panama Refining*, 293 U.S. at 431–32 ("To hold that he is free to select as he chooses from the many and various objects generally described in [a law's purpose statements], and then to act without making any finding with respect to any

object that he does select, and the circumstances properly related to that object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power.").

In a similar vein, simply looking to § 121(a), the policy or directive that the President takes need not actually be "necessary" by some *objective* means—means not otherwise specified in the FPASA.  40 U.S.C. § 121(a).  The President need only subjectively "consider[]" a policy or directive "necessary."  *Id.*  Again, the language here places all decision-making in the President's hands.

The majority equates the FPASA's use of "necessary," *id.*, to the term "requisite" in *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001), and concludes that the use of a word like "necessary" creates an intelligible principle.  I respectfully disagree with this proposition because the law at issue in *Whitman* remains inapposite for at least two reasons.

First, the phrasing of the FPASA makes the term "necessary" *give* rather than *limit* power.  That is because, again, the FPASA does not require that the President's policies actually *be* necessary, only that he subjectively "*considers* [them] necessary" to do whatever he wants under the act.  40 U.S.C. § 121(a) (emphasis added).

In contrast, the relevant language in *Whitman* pointed to "a discrete set of pollutants and [was] *based on* published air quality criteria that reflect the latest scientific knowledge," under which the "EPA *must* establish uniform national standards *at a level that is requisite to* protect public health from the adverse effects of the pollutant in the ambient air."  *Whitman*, 531 U.S. at 473 (citation omitted) (emphases added).  Reading

10

the phrases fully informs how to interpret the term "requisite." Unlike the term "necessary" here, the term "requisite" is not based solely on some subjective opinion of the President, but rather on what "*is* requisite" or "sufficient, but not more than necessary" to protect public health from the adverse effects of pollutants. *Id.* (emphasis added).

Keeping that in mind, the FPASA and *Whitman*'s uses of "necessary" and "requisite" are diametrically opposed: the FPASA seeks to *give* power to the President to do more by what he "considers" necessary (i.e., to "carry out the act"), whereas the law in *Whitman* seeks to *limit* power by objective means (i.e., at some "level" designed "to protect public health" "based on published air quality criteria that reflect the latest scientific knowledge"). Otherwise said, because of the FPASA's subjectivity, the President does not have to do what "*is* requisite," *id.*, or what *is* "necessary" to cure or respond to any situation; he need only do what *he* "considers necessary." Whereas, *Whitman*'s use of "requisite" is tethered to some objective means specified in the law there.

Second, in any case, that the FPASA includes the word "necessary" is not enough in itself to create a standard. Against this point, the majority states that the Supreme Court has approved broad delegations requiring agencies to regulate in the "public interest," to set prices that in an agency administrator's "judgment will be generally fair and equitable," and to set air quality standards that are "requisite to protect the public health." Maj. Op. at 36 (citations omitted).

11

Importantly, I seek to clarify that although the Court has "over and over upheld even very broad delegations," *Gundy*, 139 S. Ct. at 2129 (plurality), "no Supreme Court case has found that the phrasing of a law"—such as the use of the word "necessary"— "alone creates an intelligible principle," *Allstates Refractory Contractors, LLC*, 79 F.4th at 782–83 (Nalbandian, J., dissenting). To date, every law with a broad phrase that the Supreme Court has looked at had other things that provided sufficient guidance on the "boundaries of [delegated] authority." *Gundy*, 139 S. Ct. at 2129 (plurality) (citation omitted); *see Nat'l Broad. Co.*, 319 U.S. at 216 (involving a law that required fact-finding "to correct the abuses disclosed by its investigation of chain broadcasting"); *Yakus*, 321 U.S. at 419, 427 (concerning a "temporary wartime measure" to fix prices while requiring the executive to consider factors such as "prices prevailing in a stated base period" and "fair and equitable" prices).

Even the law in *Whitman* had other limits on the delegation that made it fall in line with the Supreme Court's intelligible principle requirement. *See* 531 U.S. at 473 (requiring the EPA to "base[]" its policy "on published air quality criteria that reflect the latest scientific knowledge"). Thus, the fact that the FPASA has the word "necessary" does not itself end the conversation of whether we have a nondelegation problem.

In fact, we know that using a term like "necessary" is not sufficient just by looking at *Schechter Poultry*, which involved a law using nearly identical language to the FPASA. 295 U.S. at 523 & n.4 ("The President may . . . impose such conditions . . . *as the President in his discretion deems necessary* to effectuate the policy herein declared." (emphasis added)). Thus, the use of the term "necessary," with nothing else limiting the

President but general policy objectives, "in no way limit[s] the authority" vested in him. *Id.* at 539. The FPASA should then meet the same fate as the incredibly similar law in *Schechter Poultry*: we should deem it unconstitutional.

Moreover, the only way that the FPASA limits the President is by his own accord, i.e., what he "considers necessary" as "consistent with" the FPASA. Certainly, the President can act within whatever subjective bounds he "considers necessary." 40 U.S.C. § 121(a). Indeed, he might follow an internalized golden rule from *Whitman*, that he can only issue policies "sufficient, but not more than necessary" to carry out the FPASA. 531 U.S. at 473.

But that "very choice" to do so is a form of discretion that the Supreme Court has already identified as a nondelegation no-no. *Id.* ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would itself be an exercise of the forbidden legislative authority.").

In the end, the "absence of standards" over what exactly the President may consider necessary to do makes it "impossible . . . to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426. No "boundaries of . . . authority" exist. *Gundy*, 139 S. Ct. at 2129 (plurality) (quoting *Am. Power & Light Co.*, 329 U.S. at 105). In no way can we test what the President himself considers necessary. That the bounds of delegated authority are left unbound also explains why the majority cannot hold that the agency action here was unlawful under the FPASA or arbitrary or

13

capricious.  Truly, it is hard to see how any court would be able to strike down a law under the FPASA.  As such, I would hold that a "delegation of legislative authority trenching on the principle of separation of powers has occurred." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 218 (1989) (citation omitted).

Even if the FPASA did have some sort of testable standard (it does not), it would fail to sufficiently guide the President's discretion.  Again, with great delegated power comes great specificity; that is, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475; *see Allstates Refractory Contractors, LLC*, 79 F.4th at 787 (Nalbandian, J., dissenting) (collecting cases).  And as here, when the grant of power can "affect the entire national economy," Congress "must provide substantial guidance." *Whitman*, 531 U.S. at 475.

This case poses a good example of just how far the President's authority under the FPASA can extend.  Here, the Department of Labor set up a minimum-wage scheme over the river rafting industry, imposing additional requirements on river guides who are required to have a federal permit to operate their businesses in the first place.  Minimum wages are one thing.  Nothing stops the President from imposing whatever other requirements he "considers necessary" to complete his vision of "an economical and efficient system" for "nonpersonal services."  40 U.S.C. §§ 101(1), 121(a).

River rafters aside, nothing stops the President from regulating other types of federal permits in the guise of economy and efficiency.  Indeed, permits for all sorts of activities with the federal government are all at risk, whether that be a permit for cutting

down a single Christmas tree in a national forest, a one-night stay on a federal campsite, or even a visit to the U.S. Capitol. Nothing stops the President; he may impose any conditions at any time as long as he considers the conditions necessary.

The FPASA essentially allows the President to come in and change the terms of any contract or contract-like instrument at any time based on his subjective belief of what he "considers necessary" to carry out the FPASA if he thinks it "consistent with" the law's broad policy objectives. *Id.* § 121(a). The FPASA does not only govern one industry, *see, e.g.*, *Nat'l Broad. Co.*, 319 U.S. at 214 (involving just the radio industry), nor does it provide only "temporary authority," *Gundy*, 139 S. Ct. at 2130 (plurality); *see Yakus*, 321 U.S. at 419. Rather, the delegation broadly effects *every* nonpersonal service with the federal government, which spans industries of all kinds—import and export, aviation, broadcasting, you name it.

Not to mention, "nonpersonal services" are but one subset of many "functions" over which the President can regulate. 40 U.S.C. § 101(1). The FPASA continues, stating that the President "may" similarly "prescribe policies and directives" for "related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies." *Id.* The President can no

15

doubt abuse this language to regulate entire industries while claiming that he believes it "necessary" to carry out these broad "functions." *Id.* at §§ 101(1), 121(a).

*** 

Given that the FPASA delegates the President the freedom to do as he pleases, Congress needed to confine the President's authority in more detail. It did not. Consequently, not only does the FPASA not contain (1) a fact-finding or situational requirement to arise before executive action, but the FPASA also does not have (2) a sufficient standard that guides the President's broad delegation. Therefore, the law contains no intelligible principle and thus violates the nondelegation doctrine.

## C.

Appellees make several arguments in response. To start, they argue that this Circuit's precedent "forecloses" any nondelegation concern. Aple. Br. at 36. And the majority takes the bait. Improperly, Appellees and the majority both point to this Court's decision in *City of Albuquerque v. U.S. Department of Interior*, 379 F.3d 901 (10th Cir. 2004), arguing that the case determined that the FPASA had an intelligible principle. Not so.

*City of Albuquerque* concerned whether the FPASA provided "sufficient statutory foundation" for the issuance of an executive order, which could then serve as a "basis for standing under the Administrative Procedure Act." *Id.* at 914–15. Even though the parties did not contest a nondelegation issue on appeal, this Court mentioned in passing that "Congress may delegate responsibility to the executive branch so long as Congress provides an 'intelligible principle.'" *Id.* at 914 (citation omitted). Next, this Court went

on to say—while not coming down one way or another on the issue of a potential nondelegation violation—two things.

First, we stated that Congress "chose to utilize a relatively broad delegation of authority," instructing the President to establish "'an economical and efficient system for . . . the procurement and supply' of property." *Id.* (quoting 40 U.S.C. § 101). And that was all. To be clear, this Court did *not* say anything about the FPASA's constitutionality under Article I; this Court did not reach an issue not briefed on appeal. Second, given that broad delegation, this Court went on to say that the executive order was a "valid exercise of the [FPASA's] delegated authority," *id.*—a predictable outcome given how far-reaching the FPASA is.

In all, this Court does not afford precedential weight to an opinion's discussion that alludes to a constitutional doctrine (that was *not* before the Court) in the mix of determining another issue (that *was*). *See, e.g.*, *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009) (considering as dicta "statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand" (citation omitted)). As such, whether the FPASA violates the nondelegation doctrine is a matter of first impression in this Circuit—a matter that I would answer in the affirmative.

Next, Appellees argue that the Constitution does not "deny[] to the Congress the necessary resources of flexibility and practicality . . . to perform its function." Aple. Br. at 38 (quoting *Yakus*, 321 U.S. at 425). Rather, they assert that "in our increasingly complex society, replete with ever changing and more technical problems," the Supreme

Court has understood that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372.

Yes, that all holds true. But even so, Congress still has a responsibility to have an intelligible principle in its laws by, for instance, creating "sufficiently definite and precise" standards, *Yakus*, 321 U.S. at 426, that require or "prohibit[]" the President to base executive action on the consideration of specified "factors," *Mistretta*, 488 U.S. at 375–76 (citation omitted). And the FPASA did not provide a sufficient standard here besides allowing the President to prescribe policies by any means he "considers necessary." 40 U.S.C. § 121(a); *see supra* Part II.B.

Lastly, Appellees argue that even if more specific statutory guidance might be required in some circumstances, "it is not needed in a statute that addresses federal procurement of goods and services." Aple. Br. at 38. But the cases they cite do not lend them support. To begin, the law here does not merely tell the executive to "expend[]" federal funds for specified purposes. *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322 (1937). Next, the FPASA does not just reiterate that the President has the authority to "make a valid contract" between the federal government and someone else. *Jessup v. United States*, 106 U.S. 147, 152 (1882) (collecting cases).

Here, the FPASA abdicates Congress's law-making function, leaving the President to "prescribe" any "polic[y]" or "directive[]"—whether it be a minimum wage scheme or any other regulation—that he (and he alone) "considers necessary." 40 U.S.C. § 121(a). Because of that, the FPASA diverges from "appropriations" laws that have "never

seriously been questioned." *Clinton v. City of New York*, 524 U.S. 417, 467 (1998) (Scalia, J., concurring in part and dissenting in part).

And nothing in this regulatory authority "governing private conduct" "implicate[s] the president's inherent Article II authority." *Gundy*, 139 S. Ct. at 2140 (Gorsuch, J., dissenting); *see Allstates Refractory Contractors, LLC*, 79 F.4th at 787 n.15 (Nalbandian, J., dissenting) (collecting cases on "powers that would seem to fall in the [e]xecutive's job description, such as matters dealing with war and foreign exchange").  Try as they may, Appellees fail to show how "the broader body of law concerning the nondelegation doctrine" supports their position.  *Contra* Aple. Br. at 38.

### III.

For these reasons, I respectfully dissent.